ROB BONTA, State Bar No. 202668
Attorney General of California
CATHERINE WOODBRIDGE, State Bar No. 186186
Supervising Deputy Attorney General
LEEANN E. WHITMORE, State Bar No. 214870
Deputy Attorney General
  1300 I Street, Suite 125
  Sacramento, CA 95814
  Telephone: (916) 210-7515
  Fax: (916) 322-8288
  E-mail: LeeAnn.Whitmore@doj.ca.gov
*Attorneys for Defendants State of California by and through the California Highway Patrol and Michael Bolan*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRIANNE BRAFFORD; H.D.B.; and F.J.B.,**<br><br>Plaintiffs,<br><br>v.<br><br>**STATE OF CALIFORNIA, by and through, CALIFORNIA HIGHWAY PATROL; MICHAEL BOLAN; and DOES 2-10, inclusive,**<br><br>Defendants. | Case No.: 2:24-cv-03405-DC-SCB<br><br>**DECLARATION OF LEEANN WHITMORE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     May 15, 2026<br>Time:     1:30 p.m.<br>Courtroom:  10<br>Judge:  Hon. Dena Coggins<br><br>Action Filed:  September 13, 2024 |

I, LeeAnn Whitmore, hereby declare:

1. I am an attorney at law, licensed to practice in state and federal courts in the State of California, and am employed as a Deputy Attorney General in the California Office of the Attorney General. I represent Defendants, State of California by and through the California Highway Patrol and Michael Bolan in the above case. I have personal knowledge of the matters set forth in this declaration and if called to testify could testify competently thereto.

1

2. **EXHIBIT 1** is a true and correct copy of the relevant portions of the transcript of Defendant Michael Bolan's deposition testimony taken on June 4, 2025.

3. **EXHIBIT 2** is a true and correct copy of the relevant portions of the transcript of Cherie Smith's deposition taken on January 16, 2026.

4. **EXHIBIT 3** is a true and correct copy of the relevant portions of the transcript of Cheryl Cunnigham's deposition taken on December 3, 2025.

5. **EXHIBIT 4** is a true and correct copy of the cell phone video taken by Cheryl Cunnigham on September 17, 2022.

6. **EXHIBIT 5** is a true and correct copy of the relevant footage of the CAC Fitness video which captured portions of the incident on September 17, 2022.

7. **EXHIBIT 4 and 5** are electronic files and are being submitted to the Court in accordance with Local Rule 138(*l*).

8. Prior to filing this motion, I met and conferred with Plaintiffs' counsel regarding the proposed joint statement and on the issues that I was going to move for summary judgment on. Plaintiffs' counsel agreed to dismiss the failure to treat and failure to intervene allegations in the negligence cause of action. The parties could not reach agreement on any other issues.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing statements are true and correct. This declaration was executed on April 2, 2026 at, Sacramento, California.

*/s/ LeeAnn E. Whitmore*

LEEANN E. WHITMORE

SA2024305317
39680249

2

# Exhibit 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--


BRIANN BRAFFORD; H.D.B.; and F.J.B.,

        Plaintiffs,

v.                Case No.  2:24-cv-03405-DC-SCRx

STATE OF CALIFORNIA, by and through, CALIFORNIA HIGHWAY PATROL; MICHAEL BOLAN; and DOES 2-10, inclusive,

        Defendants.

_____/



STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF MICHAEL BOLAN

WEDNESDAY, JUNE 4, 2025


Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No.  171194

about a potential altercation before you were thinking about calling for backup?  Or was that at about the same time?

A.    I'm not sure I'm following you.  So once, you know -- I'm not sure I'm following you.  So, like I said, I thought about calling for an additional unit when it doesn't seem like he's going to be cooperating with me.  That's when it crosses my mind that this situation may not, you know, go as planned, or as hoped, or whatever.

Q.    And what exactly did he do that made you think he may not cooperate?

A.    Well, he initially tries walking way from me, which I put my hand on his shoulder and stop him.  So he kind of initially takes a step back and he asks if I put my hands on him.  And I told him I did.  I told him why I was there, that there was a crash and his vehicle was involved.

At that time, he takes a step closer to me, almost like -- I'm not sure how to phrase that.  He took a step closer to me.  And at that point, I'm like, okay, this has the potential to go south.  We'll see what happens.  And once I asked him to, you know, go produce his license and registration, insurance, and that kind of stuff from his vehicle, and he seemed to comply, and

Michael Bolan

registration, did you feel you had reasonable suspicion to detain him at that point?

A.    Based on the fact I was initially told that there was potentially two vehicle -- or two people in the vehicle, and my initial description of him that he was bald -- Mr. -- Travis was not bald.  I don't know if he is the driver or he is the passenger.  I -- I don't know who he is.

Q.    So are you saying you did not feel you had reasonable suspicion at that point?

A.    Correct.  I don't know who he is.  I have no idea who he is.

Q.    And, obviously, you would then agree that you did not have probable cause to arrest him at that point?

A.    My -- upon contacting him, it was -- seemed fairly clear that he was intoxicated.  But again, I don't know if he is the driver.  I don't know if he's an intoxicated passenger.  I don't know who he is.

Q.    Okay.  So given that, did you feel you had probable cause to arrest him at that point?

A.    At what -- what point are you talking about here?

Q.    At any point prior to you asking him to go back in his vehicle to get his license or registration.

A.    At some point in talking to him, I tell him

Michael Bolan

Q.    Did he ever try to tackle you to the ground?

A.    Like a football tackle?  No.

Q.    At some point, when he reached into the car, you saw some type of duffle bag in the car?

A.    Yeah -- yes.

Q.    And you tried to make a comment with him about working out, trying to establish some rapport at that point?

A.    Correct.

Q.    And you saw him at some point come out with a knife?

A.    Yes.

Q.    And it was in his right hand?

A.    Yes.

Q.    And how far away were you from him when he came out with the knife?

A.    So he would have been by his driver's side.  I would have been toward the left rear or rear of his vehicle.  So I'm not sure.  I would have to estimate, 8 to 10 feet maybe, or somewhere in that range.

Q.    And when he came out with the knife, did he immediately try to attack you with the knife?

A.    What do you mean by attack me?

Q.    Well, charge at you, raise the knife up, try to stab you with it?  Anything like that?

Michael Bolan

A.    No.   No.

Q.    At some point did you try to take cover, using a vehicle between him and yourself?

A.    No.

Q.    Were there any vehicles in the parking lot?

A.    Yeah.   It's a Saturday afternoon on a, you know, fall day.   It's moderately busy.

Q.    At some point were you backing up, away from him, as he was walking towards you?

A.    Yeah.   I was giving him commands to drop the knife or put the knife down, or something along those lines.

Q.    And what was the approximate distance between you and him, as you were backing away from him and he was walking towards you?

A.    I would estimate it to be about the same distance, about 8 to 10 feet, or kind of a parking stall distance width between us.

Q.    And when you say a "parking stall" -- I noticed you referenced that in the your interview -- are you talking about the width or length of the stall?

A.    How much -- yeah, the width.

Q.    Okay.   And you estimate that to be 8 to 10 feet; is that correct?

A.    Yeah.   Ballpark, yes.

Michael Bolan

Q.    So do you hear him say anything to you as he's walking in your direction with the knife?

A.    I know he's yelling at me.  And I don't recall -- the only thing I recall him saying is something along the lines of, like, "Are you going to shoot me?"; or "What are you going to do, shoot me?"  Something like that.

Q.    Okay.

A.    Go ahead.

Q.    Did you see him at some point make some gesture towards his forehead with a couple of his fingers?

A.    I don't recall him doing that at the time. It's in one of the videos.  It looks like -- it looks like he's doing something like that, or he's pointing at his eyes, or something like that.  But I don't recall that without the video.  And in that video, you can hear him responding no to my request to drop the knife.

Q.    Okay.  Did you hear that at the time?

A.    I just know he's yelling at me at the time.

Q.    You couldn't make out what he was saying, other than what you have already told me?

A.    Correct.

Q.    And then were you kind of situationally aware of what was behind you as you were backing up?

A.    I tried to be.  I don't know if I've been in

Michael Bolan

that parking lot before.  I don't think I had.  So I know there's a building behind me and at some point, you know, I'd be walking into a thoroughfare or a street, if you will, that runs through the parking lot where the vehicles travel and stuff.

Q.   Were you aware there was a curb behind you, as you were walking backwards?

A.   I don't know if that was -- I don't know.  I might have assumed it, but I'm not sure.  Yeah.

Q.   Well, at some point your foot -- one of your feet hit a curb; is that correct?

A.   Yeah.  Yeah.

Q.   And do you know what that curb was to?

A.   I think I stepped in some bushes, so a planter of some sort or --

Q.   I guess what I'm wondering, as you were walking backwards, did you know the curb or planter was behind you?

A.   I'm not sure.  I know, like I said, there was a street or, you know, a thoroughfare for cars -- I don't know what you call it -- for cars in a parking lot.  I know that's behind me.  I don't recall ever thinking there is a curb or, you know, landscaping behind me.

Q.   And do you know which of your feet hit the curb?

Michael Bolan

Q.    Okay.   I guess what I'm wondering is, did your body kind of go somewhat backwards into bushes?

A.    Excuse me.   I didn't fall down, if that's what you're asking.

Q.    Right.   I got that part.   I'm just wondering -- I guess someone can lose their balance and go forward, go to the side.   I'm just trying to imagine.   Are you saying you momentarily lost your balance going backwards over the curb?

A.    That's -- I guess -- that's how I would describe it, I guess.

Q.    And did you end up in this planter somehow, when you regained your balance?

A.    So -- I'm sorry.   So, yeah, I ended up stepping in the planter.

Q.    And do you believe both of your feet were in the planter when you regained your balance?

A.    I'm not sure.   I'd have to see the video.

Q.    Did you regain your balance before firing?

A.    I believe so.   He's still coming in at me, so I believe so.

Q.    So you would have been walking backwards.   One of your feet at least hit the curb.   It would have caused you to momentarily lose your balance, going backwards into the planter.   You regained your balance,

Michael Bolan

and then you fired your shots.  Did the ordering sound correct?

A.    Yes.  But like I said, I would need to see the video to see what foot it is, what -- where I'm at exactly.

Q.    How much time would you say had passed between your foot hitting the curb and you firing your shots?

A.    I'm not sure.

Q.    Do you know if it was more or less than a second?

A.    I -- I don't know.

Q.    Did you say anything to him in between your foot hitting the curb and you firing the shots?

A.    I don't believe so.

Q.    You were aiming at his upper body when you fired?

A.    Yeah.  Correct.

Q.    And your recollection is he had the knife down at his side as he was walking towards you?

A.    Correct.  It's, you know, swinging when he's walking.

Q.    But it's in his right hand, essentially at his side?

A.    At the time -- I'm not sure.  Like I said, it's moving when he's walking, so...

Michael Bolan

Q.    When you fired your shots, was the right -- the knife still in his right hand, down by his side?

A.    I'm not sure.  I know the blade is extended outwards, you know.  So if he wants to reach out and touch me, that blade is going to be there.

Q.    Do you specifically know where the knife was when you fired your shots?

A.    I'd have to see the video.

Q.    Do you have a specific recollection of where the knife was immediately before you fired?

A.    I want to say somewhere close to his side.  But again, I'm not sure where exactly it would have been.

Q.    Do you recall ever seeing the knife when he was walking towards you, anywhere other than down by his right side?

A.    It's moving as he's walking.  So, I mean, it's, you know, in your normal, I guess gait or swing of your arms.  So I'm not quite sure how to answer that.

Q.    I'm wondering if he ever raised it up to his chest or shoulder or side of his ear or over his head?

A.    Correct.  He didn't do any of those things.

MR. GALIPO:  Okay.  I think this is a good time, maybe, for our first break, if that's okay with everybody?

MS. WHITMORE:  Sounds great.

Michael Bolan

A.   Yeah.   That's what I said earlier.   It's somewhere in there.   Ten feet seems like it's a long way, since it's a Jeep.   But somewhere in that general area.   I guess I don't know if it was step back.

Q.   Okay.   But as you're backing away from him in the parking lot, you estimated the distance to be between about 8 to 10 feet, during that timeframe, in your interview; is that fair?

A.   Yeah.   I don't recall if I said a parking stall width, but I generally think of those as 8 to 10 feet, so, correct.

Q.   And when you watched the video, did it look to you to be about 8 to 10 feet?

A.   Which video are you referencing?

Q.   Well, any of the videos that show you and Mr. Brafford as you're walking backwards and he's walking towards you?

A.   Well, I think the final video shows he's closer than that.   So I'm not sure -- I'm not sure how to answer that.

Q.   Okay.   And up until the time that your foot hits that curb, do you think the distance was about the same as you're walking backwards and he's walking towards you?

A.   No.   I feel like he's closing the distance on

Michael Bolan

me.  He's advancing in -- I feel like he's gaining on me.

Q.    You estimated in your interview he was about 6 feet away from you when you shot.  Do you recall saying that?

A.    I don't recall the -- if you have a thing I can reference?

Q.    Yeah.  Let's look at page 76, I believe.

MS. WHITMORE:  I'm showing him a paper copy of it, Dale, so --

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q.    If you could look towards the bottom.  You say, "He had closed that distance.  He was probably maybe 6 feet away, maybe closer.  I'm not sure."  Do you see the beginning of that response?

A.    Yes, sir.

MR. GALIPO:  Okay.  Thank you.  We can take that down, Marcel.

BY MR. GALIPO:

Q.    At some point while you were backing away, were you trying to put something out over your police radio?

A.    There was a time where I feel like I tried putting something out over my radio.  And I feel like he kind of made the motion that I did -- because my radio

Michael Bolan

Or "Are you going to shoot me?"  Or "What are you going to do shoot me?"  Something along those lines.

And then from the video, you can hear him responding "No" to my request to put down the knife.

In the same video, you can hear me tell him, "I don't want to shoot you."

Q.    Did you ever give him a verbal warning that you were going to shoot him?

A.    No.

Q.    When your foot hit the curb and you momentarily lost your balance, did the distance between Mr. Brafford and you decrease to some extent?

A.    I believe it did, yes.

Q.    And that's when you decided to shoot?

A.    Correct.  He's still approaching with the knife moving in his hands, you know, with the blade extended outwards.  That's when I decided to shoot, yes.

Q.    Did you ever say the blade was extended outward, at any point in your statement?

A.    I don't know if I used that phrase.

Q.    I don't remember seeing it.  Maybe it was in there.

Do you recall seeing that when you reviewed your interview recently?

A.    I don't recall.

Michael Bolan

But at the same time, I realize I'm, you know, walking through a busy parking lot. He's backing me down. I don't really want to walk into a street where cars are still driving and get hit by a car, you know?

Q. And the guy that you're referring to, there was someone else, some civilian, yelling out something to Mr. Brafford?

A. Yeah. I don't know if he's -- I don't know if "yelling" is the right word. But he's essentially kind of telling him to listen to me. He's telling Travis to listen to me and to essentially drop the knife and do what he's being told.

Q. And that person was about 20 feet or so?

A. He would have been on -- correct -- like the other side of the -- where Travis was parked. So ballpark width of the -- I guess the aisle between where you park your cars.

Q. Now, do you recall in your statement saying that, as you were walking backwards, you felt you were doing a fairly good job of maintaining that 8- to 10-foot distance?

A. Yeah.

Q. You never indicated in your statement that he was closing the distance before your foot hit the curb; did you?

Michael Bolan

A.    In my initial statement, or?

Q.    Initial statement, yes.

A.    I'd have to reference anywhere I said that.

Q.    Well, when you reviewed it recently, do you recall ever saying that he was closing the distance before your foot hit the curb?

A.    I don't know if I used that phrase.  I might have used -- I don't know if I said "advancing" or -- I'd have to --

Q.    If you look at page 68 of your statement.

A.    Which line?

Q.    Starting on line 2, you say:  "Felt like, as I'm walking backwards, I'm doing a fairly good job of maintaining what I felt like was a, you know, a parking stall with distance, you know, 8 to 10 foot or so."

Do you see that?

A.    Yeah.  Yes.

Q.    So I don't see anywhere here where you're talking about him closing the distance.  Do you?

A.    Not on this particular page, but I don't know if it was ever asked before or afterwards in there.

Q.    Okay.  You do recall saying that he never raised the knife, in your initial interview?

A.    Yeah, when -- I mean, when people say "raise the knife," I -- I think what comes to my mind is, you

Michael Bolan

know, like the Psycho movie kind of hacking motion.

So if that was the question, I would say no, he's not raising it, but it's swinging from his side in a natural motion when you walk. So it's --

Q. Right. But just so we're clear, the knife that you saw was in his right hand. His right arm was down by his right side. And what you're saying is that the right arm was moving in a natural walking motion?

A. Right. So I guess what I'm saying is I don't think I would categorize it just at his right side. To me, that's kind of saying, like, his arm is just kind of stuck there and it's not moving. It's moving with his natural gait. It's -- the knife is swinging, you know, like a person would walk. It's not just stuck there next to his side.

Q. I understand. But it's moving at a normal walking gait as opposed to, you know, raising it, like Psycho style?

A. Correct. Yes.

Q. And did you ever see him attempt to throw the knife at you?

A. No.

Q. Did you ever see him make a stabbing motion towards you?

A. Not that I recall, no.

Michael Bolan

Q.    And are you trained that you have -- you should give a verbal warning, when feasible, before shooting?

A.    I'm not sure if our policy, if that's a should or shall.  I would consider me telling him I don't want to shoot him a verbal warning, like.

Q.    Okay.  You felt that was sufficient warning?

A.    I feel like if someone told me they don't want to shoot me, I would understand that to mean one is -- it's potentially coming.

MR. GALIPO:  Okay.  That's the questions I have.

LeAnn, did you have some follow-up?

MS. WHITMORE:  Just a couple.

Madam Court Reporter, are you able to hear me okay?

THE CERTIFIED STENOGRAPHER:  Yes, I am able to hear you okay.

MS. WHITMORE:  Perfect.  I moved closer to the mic.

                    EXAMINATION

BY MS. WHITMORE:

Q.    Did you give Mr. Brafford any commands when you were in the parking lot?

A.    In regards to the knife, yes.

Q.    What commands did you give him?

A.    Something along the lines of "Drop the knife" or "Put the knife down."

Q.    Did he comply with your command?

A.    He did not.

Q.    Why did you fire your weapon?

A.    At that time, Travis had closed the distance, and he was an immediate threat to my safety.

MS. WHITMORE:   Thank you.

Nothing further.

FURTHER EXAMINATION

BY MR. GALIPO:

Q.    When you say at that time he closed the distance, you mean after your foot hit the curb and you momentarily lost your balance?

A.    His distance to me was closer at that time, but I believe he was gaining distance on me, like he was closing in on me prior to that.

Q.    Do you know if any video shows him closing the distance, prior to that?

A.    I don't know if the video from the back of the gym, if that would be the best one.  I'm not sure.

Q.    I guess the only reason I'm asking, in your interview, you appear to say that you were -- felt that you were keeping an 8 to 10 foot distance from him, and never mentioned closing the distance.  And now your

Michael Bolan

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 8th day of June, 2025.

_____

KIMBERLY D'URSO, CSR NO. 11372, RPR

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRIANNE BRAFFORD; H.D.B.; and F.J.B,

        Plaintiffs,

  vs.

STATE OF CALIFORNIA, by and through, CALIFORNIA HIGHWAY PATROL; MICHAEL BOLAN; and DOES 2-10, INCLUSIVE,

        Defendants.

CASE NO. 2:24-cv-03405-DC-SCB

VIDEO-RECORDED DEPOSITION OF:  CHERIE SMITH

Roseville, California

Friday, January 16, 2026

Reporter:  Allyson M. Farnan, CSR No. 12532

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


BRIANNE BRAFFORD; H.D.B.; and
F.J.B,

          Plaintiffs,

    vs.                              CASE NO.
                                     2:24-cv-03405-DC-SCB
STATE OF CALIFORNIA, by and
through, CALIFORNIA HIGHWAY
PATROL; MICHAEL BOLAN; and
DOES 2-10, INCLUSIVE,
          Defendants.

_____


          DEPOSITION OF CHERIE SMITH, taken at
REGUS, 915 Highland Pointe Drive, Suite 250,
Roseville, California, commencing at 10:17 A.M. on
Friday, January 16, 2026, before Allyson M.
Farnan, Certified Shorthand Reporter Number 12532
in and for the State of California.

                                              Page 2

Q    And you were involved in a motor vehicle accident on September 17, 2022?

A    Correct.

Q    Do you have any experience in law enforcement?

A    No.

Q    The officer that you interacted with on September 17th, 2022, had you ever met him before?

A    No.

Q    When you were involved in the accident on     10:24:10
September 17, 2022, what road were you on?

A    Highway 80.  Going east.

Q    Do you recall approximately where you were on Highway 80?

A    Just before the Bell exit.  I -- yeah.

Q    Is that in Auburn?

A    Correct.

Q    Do you recall approximately what time the accident was?

A    Oh, shoot.  I don't.  Either 11:00 --     10:24:45
maybe around 11:30 or 12:30.  I don't know, because I was going to host an open house.

Q    Where was the open house?

A    On Dry Creek Road in Auburn.

Q    The Traffic Crash Report has the time of

Page 10

the accident as 12:40 --

A    Okay.

Q    -- P.M.?  Does that sound accurate?

A    Yeah.  Because my open house probably started at 1:00.

Q    Do you recall what lane you were in?

A    The right hand lane, the slow lane.

Q    How many lanes are on Interstate 80 around that area, if you recall?

A    I think three.                          10:25:43

Q    What type of vehicle were you in?

A    A Porsche Macan.

Q    When did you first notice the other vehicle that was involved in the accident?

A    Just seconds before it hit me.

Q    What type of vehicle was it?

A    A white Jeep.

Q    What did you notice about the white Jeep?

A    Just that it was approaching me incredibly fast.                          10:26:15

Q    How fast were you driving?

A    Guesstimate, maybe 56.

Q    Was the white Jeep also in the slow lane?

A    Correct.

Q    When you saw the white Jeep was

Page 11

approaching you quickly, what did you do?

A   I -- first thought was, do I, like, swerve over, because I knew it was going to hit me.  And then I thought, well, I might get hit at an angle.  And then I thought I better just gas it, so I just hit the gas to lessen the impact, was my thought.

Q   And when you when you -- when you accelerated -- or, strike that.

Was there an impact?                          10:27:07

A   Yeah.  Yeah.

Q   And what happened in the impact?

A   I mean, he hit me.  He was -- he was going probably, maybe, 90, 100.  I don't know, but that's what I would guesstimate.

Q   And when he hit you, were you still in the slow lane?

A   Yes.

Q   Did he hit the rear of your vehicle?

A   Correct, yeah.                             10:27:33

Q   And after the impact, did your vehicle keep moving or did it stop?

A   It kept moving.  I pulled over off the shoulder of the freeway.

Q   And did you pull over towards the right

Page 12

or towards the left?

A    Towards the right.

Q    And were you still before the Bell Road

exit, or were you near the Bell Road exit?

A    I was before.  You couldn't see it from

where we were.  Yeah.

Q    And where was the other vehicle when you

pulled over?

A    In the center divider kind of at an

angle.                                                          10:28:23

Q    Did he pull over the same area you pulled

over or in a different area?

A    Opposite side of the freeway.  Yeah, he

was in the center divider area.

Q    And did you see the other individual that

was driving the white Jeep?

A    Yes.

Q    Where was he?

A    In the vehicle in the driver's seat.  His

head was down, and then I saw him lift his head,               10:29:00

which I felt relieved that he was okay.

Q    Did he get out of the vehicle at any

time?

A    No.

Q    Did anyone else stop?

Page 13

A    Yes.  A young couple.  I don't recall their names.

Q    And after you pulled your vehicle over to the shoulder, what did you do next?

A    The victim -- I looked to see if he was okay.  And I -- and then I saw him lift his head, and the witnesses walked up to, I think, one of my windows -- I don't really recall.  And they asked if I was okay, and I said yes.  And then we saw the Jeep take off.                                    10:30:02

And my thought was he probably went up to Bell Road exit to stop and talk because he was in the middle of the freeway.  So we both -- the witnesses and I -- both got in our vehicles and went up to the exit.

Q    So you drove your vehicle up to the exit?

A    Correct.

Q    When you say "he took off," he drove his vehicle?

A    Correct, yes.                                 10:30:34

Q    And when you got to the exit, did you stop your vehicle?

A    Yes.

Q    Where did you stop?

A    Just off to the right of the exit.

Page 14

STATE OF CALIFORNIA          )
                             )
COUNTY OF SACRAMENTO         )


        I, Allyson M. Farnan, a Certified Shorthand Reporter, do hereby certify:

        That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

        That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

        I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed my name.

        Dated:  February 2, 2026



        Allyson M. Farnan
            CSR No. 12532


                                    Page 37

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


BRIANNE BRAFFORD; H.D.B.; and      )

F.J.B.,                             )

                                    )

                Plaintiffs,         )

                                    )

    vs.                             )   Case No.:

                                    )   2:24-cv-03405-DC-SCB

STATE OF CALIFORNIA, et al.,        )

                                    )

                Defendants.         )

_____    )


            Videotaped deposition of CHERYL CUNNINGHAM, taken on behalf of Defendants, at 915 Highland Pointe Drive, #250, Roseville, California  95678, commencing at 11:18 a.m., Wednesday, December 3, 2025, before Sandra S. Petritsch, CSR No. 11684.

                                                  Page 2

(Deposition Exhibit No. 2 was marked for    11:45
identification.)    11:45

MS. WHITMORE:  Marcel, I'm marking as Exhibit 2,    11:45
the cell phone video that she took, and I'm going to try    11:45
and share my screen.  It worked earlier.    11:45

MR. SINCICH:  Okay.    11:45

Q    (By Ms. Whitmore)  I'm showing you a video that    11:45
I've marked as Exhibit 2 that's 1 minute, 6 seconds long    11:46
that I understand is a cell phone video that you took.  So    11:46
I'm going to play the video and have you confirm that it    11:46
is the video that you took on September 17th of 2022.  I    11:47
may have some further questions for you on it.  Okay?    11:47

A    Yes, ma'am.    11:47

(Video commencing.)    11:47

Q    (By Ms. Whitmore)  Was that the entire cell    11:47
phone video that you took?    11:48

A    Yes, ma'am.    11:48

Q    And is that a true and correct copy of the    11:48
video?    11:48

A    Yes, ma'am.    11:48

Q    The area where the individual is on the ground;    11:48
is that the area where the officer --    11:48

A    Apparently tripped.    11:48

Q    -- tripped?    11:48

Okay.    11:49

Page 21

REPORTER'S CERTIFICATE

I, SANDRA S. PETRITSCH, CSR No. 11684, Certified Shorthand Reporter, certify;

That the foregoing proceedings were stenographically reported by me at the time and place therein set forth and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or any of the parties nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 26th day of December, 2025.

*Sandra S. Petritsch*

SANDRA S. PETRITSCH, CSR No. 11684

Page 50

# Exhibit 4
## Cell Phone Video

# Exhibit 5

# CAC Fitness Video