**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich, Esq. (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333
Fax:     (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIANNE BRAFFORD; H.D.B.; and F.J.B., <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF CALIFORNIA (by and through California Highway Patrol); MICHAEL BOLAN; and DOES 2-10, inclusive, <br><br> Defendants | Case No.: **2:24-CV-03405-DC-SCR** <br><br> [*Honorable Dena M. Coggins*] <br> Magistrate Judge Sean C. Riordan <br><br> **DECLARATION OF RICHARD BRYCE** <br><br> [Plaintiffs' Opposition to Defendants' Motion for Summary Judgment; Memorandum of Points and Authorities in support thereof; Separate Statement of Genuine Disputes and Additional Material Facts; Decl. of Marcel F. Sincich and attached exhibits; Decl. of Richard Bruce; *filed concurrently herewith*] <br><br> Hearing:   May 15, 2026 <br> Time:      01:30 p.m. <br> Crtrm:     10 |

DECLARATION OF RICHARD BRYCE

## DECLARATION OF RICHARD BRYCE

I, Richard Bryce, hereby declare as follows:

1.      I am a police practices expert retained in this matter to review material and render opinions, if any, related to police tactics and force according to standard law enforcement training.

2.      I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3.      Attached hereto as "**Exhibit A**" is a true and correct copy of my Expert Report in this matter, including my Curriculum Vitae setting forth my qualifications to provide expert testimony, both of which I incorporate herein.  A summary of those qualifications is also as follows:

a.      I am qualified and competent to render my opinions in the case before this Court due to my education, experience, training and professional activities in criminal justice. I am currently self-employed as a criminal justice consultant and enter private engagements with criminal justice agencies to perform a wide range of services, including audits and inspections, review of policy and procedure, administrative investigations, audits of practices and processes, development and delivery of training courses, original research, surveys, draft policies and procedures, staff development, meeting and conference facilitation, and expert testimony in court and before governing bodies.

b.      I have over 33 years of continuous and escalating experience in law enforcement. My initial experience was as a patrol deputy with the Ventura County Sheriff's Department assigned to the contract city of Camarillo. I performed routine patrol, traffic investigation and criminal investigation. I was later assigned to a special enforcement patrol unit in the unincorporated area of Ventura County. I performed surveillance of known criminals, gang activity, and special events along with assisting routine patrol deputies with their responsibilities.

c.      In October of 1968, I was promoted to Senior Deputy and assigned as a training officer at the Ventura County Sheriff's Academy. From April 1972, until December 1976, I was assigned to the Criminal Investigation Division. During that period

of time I worked burglary investigation, undercover fencing and property crime investigation, undercover vice investigation, undercover narcotics investigation and undercover criminal intelligence investigation.

d.    In December of 1976, I was promoted to sergeant and assigned to the Custody Division. I began my custody experience as a shift sergeant assigned to the Branch Jail Honor Farm and was later assigned as the administrative sergeant of that facility. I was responsible for budget, scheduling of personnel and development of operational policy.

e.    In May of 1978, I was transferred to the Court Services Division. I was the supervisor of all bailiff's and court security deputies servicing the Ventura County Superior Court.

f.    In January of 1979, I was promoted to Lieutenant and assigned to the Custody Division as the Facility Manager of the Oxnard Branch Jail. I also had collateral management responsibilities for the Sheriff's Inmate Transportation Unit and the Court Holding Facilities.

g.    In November of 1979, I was transferred to the Support Services Division as the Court Services Bureau Commander. I was responsible for the management of all court services and civil process service. I was also given the responsibility of justification, preparation, presentation and implementation of a merger of the Ventura County Marshall's Department into the Sheriff's Court Services Division.

h.    In December of 1980, I was transferred to the Special Services Division as the Special Investigations Bureau Commander. I was responsible for the management and operation of the Sheriff's Narcotics, Vice, and Criminal Intelligence Units.

i.    In October of 1982, I was promoted to Commander and assigned as the Commander of the Special Services Division. I was responsible for the overall operation and administration of the Special Services Division, which included; major criminal investigation, narcotics investigation, vice and intelligence investigation, criminalistics laboratory, Sheriff's Air Unit and other special investigation functions.

j.      In February of 1983, I was assigned as the Commander of the Custody Division. My responsibilities in that assignment included the operation and administration of 5 custodial facilities, 339 employees and the supervision of over 1500 inmates. In March of 1986, I was appointed Assistant Sheriff. I was responsible for the administration and direction of 4 of the 8 major divisions within the Sheriff's Department. My primary responsibilities included; providing administrative direction to the Custody Division and its 5 facilities, giving administrative oversight to the Project Development Division with the design, development and construction of a new 2000 bed jail, providing administrative control over the entire Department's operational budget, giving primary approval for most disciplinary actions within the Department, presenting budget requests and other Department related matter to the Board of Supervisors, and representing the Sheriff in public forums.

k.      In June of 1993, I was appointed Undersheriff and served in that position until my retirement in August of 1999. As Undersheriff, I was responsible for the administration of the entire Sheriff's Department under the direction of the Sheriff.

l.      At the time of my appointment the Sheriff's Department was reorganized into 4 major divisions each headed by a Chief Deputy. Each Chief Deputy reported directly to me. The 4 divisions of the Sheriff's Department were comprised of the Detention Services Division, East Valley Police Services Division, West County Police Services Division, and Support Services Division. The police services divisions included police service for the 5 contract cities of Thousand Oaks, Camarillo, Moorpark, Ojai and Fillmore. The Sheriff's Department employed 1355 individuals with an operational budget in excess of $140,000,000.00.

4.      I have reviewed the following materials in making my opinions: Plaintiffs' Second Amended Complaint; Protective Order; Deposition of Officer Michael Bolan; Incident Reports and Investigative Records; Incident Videos; Photographs of the scene and evidence; Scene Photos; Policies and Training documents; Defendants' Responses to Discovery Requests; and POST Learning Domains.

5. **Officer Bolan failed to utilize non-lethal force to subdue Mr. Brafford, before shooting him twice with his firearm**. Officer Bolan was armed with a Taser when he confronted Mr. Brafford. When Mr. Brafford was walking towards Officer Bolan with a knife in his hand, and refusing to drop the knife, Officer Bolan could have used his Taser to cause Mr. Brafford to drop the knife and follow Officer Bolan's commands, or otherwise subdue Mr. Brafford, rather than waiting until he subjectively felt the necessity to use deadly force. Officer Bolan could have de-escalated the situation, below the level of using deadly force, including by using his Taser to cause Mr. Brafford to stop walking towards him with a knife in his hand. The Taser is a less-lethal use of force and could be used as a deescalation tool to overcome resistance. The Taser is designed to cause neuromuscular incapacitation. Officer Bolan had the opportunity to use the Taser and failed to do so. CHP policy on the use of deadly force states, "<u>Deadly Force</u>. An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances that such force is necessary in defense of human life. In determining whether deadly force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case. If reasonably safe and feasible to do so, officers shall use other available resources and techniques." Officer Bolan failed to request assistance when he felt Mr. Brafford would not comply with his directives. He stated in his interview. "He kind of walks back to his jeep. And since it was, you know, he's kind of milling around and maybe tried leaving, I don't remember consciously thinking it, but I switched spots. I went back to the back of his vehicle. If I'm going to get into a fight, because of my leg, I know I can't really squat down and it's – when I bend, it's almost like a curtsey. Like I have to kick by leg out – because my foot doesn't bend. I can't do that between vehicles if this is going to go more sideways. When he tries walking away, it crosses my mind at this point and I don't know if I did, but I feel like – I'm not sure if I did, but I was like, I might need another unit. It crossed my mind. I don't know if I put it out." It appears that Officer Bolan was not fully physically capable and/or not confident in his ability to handle this situation alone based on his prior injuries and experience. Under these circumstances, Officer Bolan should have called and waited for backup prior to engaging with Mr. Brafford or immediately upon his encounter with Mr. Brafford. Here there

DECLARATION OF RICHARD BRYCE

were reasonable and available resources and techniques that Officer Bolan could have utilized rather than escalating the situation and using deadly force but failed to do so. These include calling for backup, using cover and distance, using and creating time, tactical communication and de-escalation, appropriate warnings, and use of less-lethal force.

6.    **Mr. Brafford did not pose an imminent threat of death or serious bodily injury to Officer Bolan or other individuals at the time Officer Bolan shot him**. Imminent means a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. "Totality of the Circumstances" means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force. Officer Bolan stated in his second interview, "But yeah, upon seeing the knife, I draw my weapon. It's kind of always kind of at his side, but it's kind of swinging when he's walking. You know, it's never up like a, you know, like the move Psycho or anything like that. But it's always down at his side, just kind of swinging." From my review of the record, Mr. Brafford did not attempt to attack or harm Officer Bolan with the knife and did not make an aggressive gesture with the knife toward Officer Bolan. The videos show that Mr. Brafford was not running or moving fast towards Officer Bolan but instead was moving slowly and appeared to slow down in the moments prior to the use of deadly force. Officer Bolan stated that he walked backwards for approximately 75 feet. Additionally, it appears from the investigation record and videos that there was approximately 20 feet between Officer Bolan and Mr. Brafford when Officer Brafford decided to use deadly force. Officer Bolan failed to use the available time, space and distance to maneuver, de-escalate, use cover, and attempt less-intrusive alternatives. There was nothing at the time of the use of deadly force to indicate that Mr. Brafford had the apparent intent to immediately cause death or serious bodily injury to Officer Bolan. Furthermore, given his speed of movement, distance, the knife down by his side, Mr. Brafford did

-6-                    Case No.: 2:24-CV-03405-DC-SCR
DECLARATION OF RICHARD BRYCE

not have the present opportunity to immediately cause death or serious bodily injury to Officer Bolan. It is my opinion that Officer Bolan used deadly force based on the subjective fear of future harm that Mr. Brafford may get within striking distance of Officer Bolan, may raise the knife in a threatening manner and/or may attempt to use the knife to harm Officer Bolan. That fear of future harm, no matter how great the fear, is insufficient to justify the use of deadly force here.

7.    **Officer Bolan failed to notify Mr. Brafford that he would use deadly force if Mr. Brafford did not drop the knife**. CHP policy on the use of deadly force states, "Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts." Officer Bolan gave commands including, "Put the knife down," and "I don't want to shoot you". However, an appropriate warning, based on the training, is a specific command followed by the specific and realistic consequences of not following that command. Officer Bolan stated that he used deadly force primarily because Mr. Brafford was walking towards him and had a knife. Officer Bolan failed to warn Mr. Brafford that if he did not stop walking or if he got too close to Officer Bolan that deadly force would be used and he could die. Similarly, Officer Bolan did not warn Mr. Brafford that if he did not drop the knife or if he did anything threatening with the knife that deadly force would be used against him and he could die.

8.    In an officer-involved shooting case where the subject is armed with a knife, generally there are three specific factual considerations when evaluating the use of deadly force: (1) What is the subject doing with the knife; (2) Distance between the subject and the officer; and (3) the speed of movement, if any.

a.    Distance is important because if the distance is great enough, the subject is not an immediate threat of death or serious bodily injury even if moving fast or gesturing in a threatening way with the knife. With sufficient distance (and/or cover), there is no justification for using deadly force. For the subject to be an immediate threat of death or serious bodily injury with a knife, generally the subject must be in striking distance of a person amongst other factors. In other words, with sufficient distance there is not

"opportunity" to immediately cause death or serious bodily injury that must be immediately responded to with deadly force. See Cal. Pen. Code §835a.

b.    The conduct of the subject with the knife is important because it informs on the subject's apparent intent. When a subject is wielding a knife in a threatening manner, by lifting the knife overhead, swinging the knife, slashing with the knife, or drawing back as though to stab with the knife, then a reasonable officer *may* perceive the subject as having the apparent intent to immediately cause death or serious bodily injury (also depending on the distance). On the other hand, if the subject is not doing anything threatening with the knife in hand but merely holding it down by his or her side, then from that fact alone, no reasonable officer would perceive the subject as having the apparent intent to immediately cause death or serious bodily injury. Even if the subject is within striking distance with a knife in hand, if the subject does not have the apparent intent to immediately cause death or serious bodily injury, the law enforcement officer may not use deadly force. See Cal. Pen. Code §835a.

c.    Speed of movement is important because it relates to whether the subject has the opportunity or apparent intent to immediately cause death or serious bodily injury. If the subject is rapidly closing the distance on the law enforcement officer, then the subject *may* get within striking distance and *may* become a deadly threat in consideration of the totality of circumstances. However, if the subject is moving slowly, at certain distances, the subject will not have the opportunity to immediately cause death or serious bodily injury. Furthermore, if the subject is moving slowly, it could indicate that the subject does not have the apparent intent to immediately cause death or serious bodily injury. See Cal. Pen. Code §835a.

9.    It is my opinion that at the time of the shots, Mr. Brafford was positioned at much greater than 6 feet away from Officer Bolan. Based on my review of the record, the last visually identifiable approximate locations of Officer Bolan and Mr. Brafford places Mr. Brafford approximately 17 feet from where Officer Bolan used deadly force in the planter. Approximately two seconds from Mr. Brafford last being seen on the Cell Phone Video, Officer Bolan fired two

shots. Moreover, the record indicates that Mr. Brafford was approximately 6 feet tall and did not fall into Officer Bolan or into the planter despite falling forward after being shot.

I declare under penalty of perjury that the foregoing is true and correct.  Executed 16th day of April 2026,

_____
Richard Bryce

DECLARATION OF RICHARD BRYCE