# EXHIBIT A

Richard S. Bryce

Criminal Justice Consulting

Date: February 13, 2026

# Rule 26 Report
# BRAFFORD V. STATE OF CALIFORNIA
## Case No.: 2:24-CV-03405-DC-SCR

The following report is respectfully submitted in compliance with Section (a)(2)(B) of Rule 26. If called upon to testify as a witness in the above-entitled matter, I would offer the following opinions based on the information that was available to me at the time the report was prepared:

**ORIGIN OF ACTIVITY:**

On October 22, 2025, I was retained by the Law Offices of Dale K. Galipo to review the documents, videos and evidence provided, and to render my opinions as to the appropriateness of the deadly force used to apprehend Travis Brafford by a California Highway Patrol Officer Michael Bolan.

**DATA AND INFORMATION RELIED UPON:**
1. Protective Order.
2. First Amended Complaint.
3. Scheduling Order.
4. Plaintiff's Disclosers.
5. CHP's Disclosers.
6. Officer Bolan's Disclosers.
7. CHP Privilege Log.
8. CHP Use of Force Policy.
9. Defendant's Responses to Plaintiff's Requests for Admission.
10. Defendant's Response to Interrogatories.
11. Deposition of Officer Michael Bolan.
12. Video Deposition of Officer Michael Bolan.
13. Auburn PD reports and video of incident.
14. Placer County incident reports and videos of incident.
15. CHP Critical Incident Investigation Log.

16. CHP Description of Critical Incident.
17. CHP TOC.
18. CHP Case Identification Report.
19. CHP Case Synopsis.
20. CHP Investigative Summary.
21. CHP Crime Scene Evidence Collection.
22. Placer County DA Investigative Report.
23. Critical Incident Administration Findings.
24. CHP Supplemental Report.
25. Officer Bolan's Statement.
26. Interview of Mike Bolan.
27. CHP Memo to Officer Bolan.
28. General Location Diagrams.
29. MAIT Supplemental Report.
30. Coroner's Field Report.
31. Property Receipt.
32. Coroner's Supplemental Narrative.
33. Autopsy Record.
34. Incident Detail Report.
35. Incident Scene Photos.
36. CAC Fitness Gym video.
37. Cell Phone Video of Witness Cunningham.
38. Cell Phone Video of Witness Wyatt Bosworth.
39. Officer Bolan MVARS videos.
40. Videos of witness statements and medical care.
41. Video of round count of Officer Bolan firearm.
42. Audio recording of Officer Bolan interview.
43. Audio recording of Officer Bolan 2nd interview.
44. CHP Dispatch Audio Recordings.
45. Air Op Cam Video.
46. Inside Jeep Video.
47. California Penal Code.
48. POST Learning Domains.

**Case Overview:**

On 17 September 2022, at approximately 1:11 PM, Officer Michael Bolan attempted to detain Travis Brafford, who was suspected of being involved in a collision with another vehicle. Officer Bolan reported that when he approached Mr. Brafford, he reached in his vehicle and retrieved a knife.

Officer Bolan stated that he drew his firearm and began walking backwards away from Mr. Brafford.  While Officer Bolan was walking backwards, he stumbled on a curb in the parking lot.  Officer Bolan then fired his weapon twice at Mr. Brafford, striking him in his chest.

Mr. Brafford was transported to the hospital by ambulance and was pronounced deceased at 2:17 PM.

## Opinions and Observations:

1.  **Officer Bolan failed to utilize non-lethal force to subdue Mr. Brafford, before shooting him twice with his firearm.**

    Officer Bolan was armed with a Taser (electronic control device) when he confronted Mr. Brafford.[1]

    When Mr. Brafford was walking towards Officer Bolan with a knife in his hand, and refusing to drop the knife, Officer Bolan could have used his Taser to cause Mr. Brafford to drop the knife and follow Officer Bolan's commands, or otherwise subdue Mr. Brafford, rather than waiting until he subjectively felt the necessity to use deadly force.

    Officer Bolan could have de-escalated the situation, below the level of using deadly force, including by using his Taser to cause Mr. Brafford to stop walking towards him with a knife in his hand.

    The Taser is a less-lethal use of force and could be used as a de-escalation tool to overcome resistance.  The Taser is designed to cause neuromuscular incapacitation.  Officer Bolan had the opportunity to use the Taser and failed to do so.

    CHP policy on the use of deadly force states, "Deadly Force.  An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life.  In determining that such force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case.  If

---

[1] Critical Incident Investigation Team Report, p.16, line 26.

reasonably safe and feasible to do so, officers shall use other available resources and techniques."[2]

Officer Bolan failed to request assistance when he felt Mr. Brafford would not comply with his directives. He stated in his interview.

> "He kind of walks back to his jeep. And since it was, you know, he's kind of milling around and maybe tried leaving, I don't remember consciously thinking it, but I switched spots. I went back to the back of his vehicle. If I'm going to get into a fight, because of my leg, I know I can't really squat down and it's – when I bend, it's almost like a curtsey. Like I have to kick by leg out – because my foot doesn't bend. I can't do that between vehicles if this is going to go more sideways. When he tries walking away, it crosses my mind at this point and I don't know if I did, but I feel like – I'm not sure if I did, but I was like, I might need another unit. It crossed my mind. I don't know if I put it out.[3]

It appears that Officer Bolan was not fully physically capable and/or not confident in his ability to handle this situation alone based on his prior injuries and experience. Under these circumstances, Officer Bolan should have called and waited for backup prior to engaging with Mr. Brafford or immediately upon his encounter with Mr. Brafford.

Here there were reasonable and available resources and techniques that Officer Bolan could have utilized rather than escalating the situation and using deadly force but failed to do so. These include calling for backup, using cover and distance, using and creating time, tactical communication and de-escalation, appropriate warnings, and use of less-lethal force.

2.  **Mr. Brafford did not pose an imminent threat of death or serious bodily injury to Officer Bolan or other individuals at the time Officer Bolan shot him.**

Imminent means a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the

---

[2] CHP Use of Force Policy, p. 1-7
[3] Transcript of Officer Bolan's interview, p. 45, lines 14-24, p. 46, lines 1-8.

same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person.  An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.[4]

Totality of the Circumstances means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force.[5]

Officer Bolan stated in his second interview, "But yeah, upon seeing the knife, I draw my weapon.  It's kind of always kind of at his side, but it's kind of swinging when he's walking.  You know, it's never up like a, you know, like the move Psycho or anything like that.  But it's always down at his side, just kind of swinging."[6]

From my review of the record, Mr. Brafford did not attempt to attack or harm Officer Bolan with the knife and did not make an aggressive gesture with the knife toward Officer Bolan.  The videos show that Mr. Brafford was not running or moving fast towards Officer Bolan but instead was moving slowly and appeared to slow down in the moments prior to the use of deadly force.  Officer Bolan stated that he walked backwards for approximately 75 feet.  Additionally, it appears from the investigation record and videos that there was approximately 20 feet between Officer Boland and Mr. Brafford when Officer Brafford decided to use deadly force.  Officer Bolan failed to use the available time, space and distance to maneuver, de-escalate, use cover, and attempt less-intrusive alternatives.

There was nothing at the time of the use of deadly force to indicate that Mr. Brafford had the apparent intent to immediately cause death or serious bodily injury to Officer Bolan. Furthermore, given his speed of movement, distance, the knife down by his side, Mr. Brafford did not have the present opportunity to immediately cause death or serious bodily injury to Officer Bolan.  It is my opinion that Officer Bolan used deadly

---

[4] Penal Code Section 835a(e)(2).

[5] *Id.* 835a(e)(3).

[6] Transcript of Officer Bolan's interview,  p. 67, lines 6-14.

force based on the subjective fear of future harm that Mr. Brafford may get within striking distance of Officer Bolan, may raise the knife in a threatening manner and/or may attempt to use the knife to harm Officer Bolan. That fear of future harm, no matter how great the fear, is insufficient to justify the use of deadly force here.

**3.  Officer Bolan failed to notify Mr. Brafford that he would use deadly force if Mr. Brafford did not drop the knife.**

CHP policy on the use of deadly force states, "Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts."[7]

Officer Bolan gave commands including, "Put the knife down," and "I don't want to shoot you". However, an appropriate warning, based on the training, is a specific command followed by the specific and realistic consequences of not following that command. Officer Bolan stated that he used deadly force primarily because Mr. Brafford was walking towards him and had a knife. Officer Bolan failed to warn Mr. Brafford that if he did not stop walking or if he got too close to Officer Bolan that deadly force would be used and he could die. Similarly, Officer Bolan did not warn Mr. Brafford that if he did not drop the knife or if he did anything threatening with the knife that deadly force would be used against him and he could die.

**4.  Officer Bolan was aware that Mr. Brafford may be impaired at the time he confronted him in the parking lot.**

Officer Bolan stated in his interview with investigators, "And at this point, I could see, it looked like he had a welt on his head and other dried blood on his face from the accident or crash or – so, at that point, he walks – it seemed like he was, you know, going to comply."[8]

He also stated, "And I failed to mention, at the start of this when I contacted Mr. Brafford, I think I said he had glasses on. I think he took

---

[7] CHP Use of Force Policy, p. 1-8

[8] *Id.* p. 45, lines 9-14.

them off.  I don't remember them at the end, but he had the odor of alcohol.  He appeared like he was intoxicated."[9]

Although Officer Bolan stated in his interview, I had no doubt that he was intoxicated, Officer Bolan did not know whether Mr. Brafford was impaired but suspected him of being impaired.  Officers are trained in that when dealing with people who may be impaired, de-escalation, distance, backup and tactical communication become even more important.

**Qualifications:**

I am qualified and competent to render my opinions in the case before this Court due to my education, experience, training and professional activities in criminal justice.

I am currently self-employed as a criminal justice consultant and enter private engagements with criminal justice agencies to perform a wide range of services, including audits and inspections, review of policy and procedure, administrative investigations, audits of practices and processes, development and delivery of training courses, original research, surveys, draft policies and procedures, staff development, meeting and conference facilitation, and expert testimony in court and before governing bodies.

I have over 33 years of continuous and escalating experience in law enforcement. My initial experience was as a patrol deputy with the Ventura County Sheriff's Department assigned to the contract city of Camarillo.  I performed routine patrol, traffic investigation and criminal investigation.  I was later assigned to a special enforcement patrol unit in the unincorporated area of Ventura County.  I performed surveillance of known criminals, gang activity, and special events along with assisting routine patrol deputies with their responsibilities.

In October of 1968, I was promoted to Senior Deputy and assigned as a training officer at the Ventura County Sheriff's Academy.

From April 1972, until December 1976, I was assigned to the Criminal Investigation Division.  During that period of time I worked burglary investigation, undercover fencing and property crime investigation, undercover vice

---

[9] *Id.* p. 50, lines 19-24.

8

investigation, undercover narcotics investigation and undercover criminal intelligence investigation.

In December of 1976, I was promoted to sergeant and assigned to the Custody Division. I began my custody experience as a shift sergeant assigned to the Branch Jail Honor Farm and was later assigned as the administrative sergeant of that facility. I was responsible for budget, scheduling of personnel and development of operational policy.

In May of 1978, I was transferred to the Court Services Division. I was the supervisor of all bailiff's and court security deputies servicing the Ventura County Superior Court.

In January of 1979, I was promoted to Lieutenant and assigned to the Custody Division as the Facility Manager of the Oxnard Branch Jail. I also had collateral management responsibilities for the Sheriff's Inmate Transportation Unit and the Court Holding Facilities.

In November of 1979, I was transferred to the Support Services Division as the Court Services Bureau Commander. I was responsible for the management of all court services and civil process service. I was also given the responsibility of justification, preparation, presentation and implementation of a merger of the Ventura County Marshall's Department into the Sheriff's Court Services Division.

In December of 1980, I was transferred to the Special Services Division as the Special Investigations Bureau Commander. I was responsible for the management and operation of the Sheriff's Narcotics, Vice, and Criminal Intelligence Units.

In October of 1982, I was promoted to Commander and assigned as the Commander of the Special Services Division. I was responsible for the overall operation and administration of the Special Services Division, which included; major criminal investigation, narcotics investigation, vice and intelligence investigation, criminalistics laboratory, Sheriff's Air Unit and other special investigation functions.

In February of 1983, I was assigned as the Commander of the Custody Division. My responsibilities in that assignment included the operation and administration of 5 custodial facilities, 339 employees and the supervision of over 1500 inmates.

8

In March of 1986, I was appointed Assistant Sheriff.  I was responsible for the administration and direction of 4 of the 8 major divisions within the Sheriff's Department.  My primary responsibilities included; providing administrative direction to the Custody Division and its 5 facilities, giving administrative oversight to the Project Development Division with the design, development and construction of a new 2000 bed jail, providing administrative control over the entire Department's operational budget, giving primary approval for most disciplinary actions within the Department, presenting budget requests and other Department related matter to the Board of Supervisors, and representing the Sheriff in public forums.

In June of 1993, I was appointed Undersheriff and served in that position until my retirement in August of 1999.  As Undersheriff, I was responsible for the administration of the entire Sheriff's Department under the direction of the Sheriff.  At the time of my appointment the Sheriff's Department was reorganized into 4 major divisions each headed by a Chief Deputy.  Each Chief Deputy reported directly to me.  The 4 divisions of the Sheriff's Department were comprised of the Detention Services Division, East Valley Police Services Division, West County Police Services Division, and Support Services Division.  The police services divisions included police service for the 5 contract cities of Thousand Oaks, Camarillo, Moorpark, Ojai and Fillmore.  The Sheriff's Department employed 1355 individuals with an operational budget in excess of $140,000,000.00.

FORMAL EDUCATION:

1985        Master of Public Administration
            University of La Verne

1982        Bachelor of Science: Criminal Justice
            University of La Verne

PROFESSIONAL CERTIFICATES:

    P.O.S.T.  Management Certificate

    P.O.S.T.  Supervisory Certificate

    P.O.S.T.  Advanced Certificate

    P.O.S.T.  Intermediate Certificate

P.O.S.T.  Basic Certificate

California Community College Teaching Credential (life)

PROFESSIONAL MEMBERSHIPS Past and Present:

American Correctional Association

American Jail Association

California State Sheriff's Association

California Peace Officer's Association

California Narcotic Officer's Association

National Sheriff's Association

Southern California Jail Manager's Association

Ventura County Deputy Sheriff's Association

## PREVIOUS CASES:

Mesa, Arizona
> Spencer v. City of Mesa – Feb 25 P

Hemet, California
> Arturro Jordan v. City of Hemet – Dec 25 P

Santa Clara County, California
> Leal v. Officer Siegal et al. – Sep 06 D
> Garcia et al. v. County of Santa Clara – Dec 06 D
> Richard Carrasco v. County of Santa Clara – Jan 07 D
> Marino v. County of Santa Clara – Mar 07 D

Fresno, California
> Eliseo Renteria v. Tulare County – Sep 03 P
> Cindy Staunton v. City of Clovis – Jun 01 P

Brock v. County of Fresno – Jul 21 P
Flores v. County of Fresno – Jan 22 P

City of Houston, Texas
Claudia Navarro Pineda, et al. v. City of Houston – Dec 00 D

Riverside County, California
Zaragoza v. Riverside County – Mar 22 P

City of Bakersfield, California
Perry v. City of Bakersfield – Sep 20 P

Pasadena, Texas
Moises Delao v. The City of Pasadena, Texas – Dec 96 D

Calaveras County, California
Payne v. Calaveras County – Jan 20 P

Palm Springs, California
Sandra Lee Denham v. City of Palm Springs – Nov 99 P

San Joaquin County, California
Friends v. San Joaquin County – Mar 19 P

Harris County, Texas
Alberti, v. Harris County – Apr 92 D
Laura Sherrard v. Harris County – Nov 93 D
Robert Earl McMullen III v. Harris County – Sep 94 D
Jason Aguillard v. Joseph McGowen – Feb 96 D
Alphonso Robinson v. Constable A. B. Chambers – May 98 D
Brad Allen Mathes v. Harris County – Jun 99 D

Liberty County, Texas
Womack v. Liberty County – Nov 93 D

Orleans Parish, Louisiana
Hamilton v. Morial – Jun 93 D

Warren, Michigan
Sondey v. Woloweic et al – Feb 16 P

12

Yuba County, California
        Court Appointed Monitor -- Present

Cass County, Michigan
        Nash v. Sheriff Underwood, Jr., et al. – Feb 16 P

Bexar County, Texas, Texas Attorney General
        DeVonish v. Lopez – Oct 93 D

Mendocino County, California
        Neuroth, et al. v. Mendocino County, et al. – Oct 17 D

San Bernardino County, California
        Mendoza v. San Bernardino County – Feb 21 P
        Person-Lynn v. San Bernardino County – Apr 22 P
        James Wright v. San Bernardino County – Jan 25 P

Kern County, California
        McClure v. PTS – Dec 19 D

Monterey County, California
        Thomas Dewey v. Monterey County, et al. – June 15 D
        Claypole v. County of Monterey, et al. – Sep 15 D
        Villerreal v. County of Monterey – May 17 D
        Hernandez v. County of Monterey Court appointed monitor Present

Chino, California
        Brown v. City of Chino – July 21 P

San Mateo County, California
        Doe v. San Mateo County, et al. – Sep 17 P

Los Angeles County, California
        Dion Starr v. County of Los Angeles et al. --  09 D
        William Russell v. County of Los Angeles et al. – Jul 09 D
        Justin Henderson, et al. v. County of Los Angeles – Sep 10 D
        Ronald Johnson v. County of Los Angeles – Nov 10 D
        Kevin King v. County of Los Angeles – May 11 D
        Mariano Duvall v. Richard Torres et al. – Aug 12 D

XYZ Distributors Inc. v. County of Los Angeles – Oct 12 D
Christopher Brown v. County of Los Angeles – Jan 13 D
Timothy Smith v. County of Los Angeles – May 13 D
Mancilla v. County of Los Angeles – May 13 D
Tyler Willis v. County of Los Angeles – Jun 13 D
Frank Martinez v. County of Los Angeles – Jan 15 D
Jaime A. Moreno v. County of Los Angeles – Aug 15 D
Cory Crittenden v. County of Los Angeles – Aug 25 P

City of Santa Monica, California
Gonzales v. City of Santa Monica – Sep 21P

City of Huntington Beach, California
Shay v. City of Huntington Beach – 18 P

City of Hemet, California
Arturro Jordan v. City of Hemet Dec 25 P

City of Long Beach, California
Pream v. City of Long Beach – May 18 P
Eugene Martindale v. City of Long Beach – June 22 P
Rudolph v. City of Long Beach – Jan 23 P

City of Los Angeles, California
Kathleen Washington v. City of Los Angeles – Apr 12 D
Hendley v. City of Los Angeles – Oct 16 P
Murillo v. City of Los Angeles – Jul 22 P
Gautier v. City of Los Angeles – Dec 22 P
Peralta v. City of Los Angeles – Mar 25 P
Petit v. City of Los Angeles – Aug 25 P

United States Department of Justice
Doe v. Johnson – Jan 16 D
Lion v. ICE – Feb 16 D

/ / /

/ / /

14

**FEE SCHEDULE:**

Initial Case Review $2000.00

This is a one-time fee for an initial review and assessment of the case and includes a preliminary written or oral report to client.

Consultation on Management and Operations ($250.00 per hour)

This hourly fee includes all labor associated with the study of jail or law enforcement management and operations, including preparation of reports and travel to and from site.

Case Review and Preparation ($250.00 per hour)

This hourly fee includes review of documents, interviews, site inspection, preparation of expert report and affidavit; and any other associated labor performed as directed.

Travel - $100.00 per/hr.

Formal Presentations ($2500.00 per day or $1500.00 per half day)

This fee applies to Court appearances, depositions and hearings.

Expenses (actual)

Travel related expenses, including transportation, on site lodging and meals; will be billed at actual cost. Other expenses associated with the provision of consultation or expert testimony may include postage, vehicle rental, parking, ground and air transportation, telephone and photography, all of which will be billed at actual cost.

Respectfully submitted,

*/s/ Richard Bryce*

Richard S. Bryce