# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--


BRIANN BRAFFORD; H.D.B.;
and F.J.B.,

      Plaintiffs,

v.                          Case No.  2:24-cv-03405-DC-SCRx

STATE OF CALIFORNIA, by and
through, CALIFORNIA HIGHWAY
PATROL; MICHAEL BOLAN; and
DOES 2-10, inclusive,

      Defendants.

_____/


STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF MICHAEL BOLAN

WEDNESDAY, JUNE 4, 2025


Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No.  171194

Michael Bohn

reviewed, other than what you have mentioned so far?

A.   I reviewed our -- I guess that's it.

Q.   Did you review the use of force policy?

A.   Yes.  I'm sorry.  I did.  Correct.

Q.   And that included the use of deadly force?

A.   Yes, sir.

Q.   So before we talk about the date of the incident, I want to just ask you some background questions, just to learn a little bit more about you.

Starting with your education, I'm assuming you graduated high school?

A.   Yes.

Q.   What year did you do that in?

A.   It would have been 1998.

Q.   How old are you now?

A.   I am 45.

Q.   How tall are you?

A.   About 6 foot.

Q.   How much do you currently weigh?

A.   190-ish.

Q.   You smiled slightly.  Are you slightly gaining weight as you are getting older?

A.   The suit still fits -- and it was ten years old -- so I was pleased with that.  Maybe a little bit.

Q.   That's a good sign.

Michael Bohn

Did you play any sports in high school?

A.    No.

Q.    Did you go to any college after high school?

A.    I went to Sierra College in Rocklin.

Q.    Did you study anything in particular?

A.    My major was administration of justice.

Q.    And at some point did you get a degree?

A.    No.  I got into the highway patrol academy before I finished.  I think I finished with 49 or 40 -- somewhere in there -- 45 credits, something like that.

Q.    When did you go to the academy?

A.    The highway patrol academy was 2007.

Q.    Were you generally assigned to patrol during your tenure with the highway patrol?

A.    Generally, yeah.  I did a two-year stint at our headquarters.  Yeah.  But generally, other than that, yeah, I rode patrol.

Q.    From reading your statement, I understand, it might have been in 2018, at some point you were injured when you were struck by a vehicle?

A.    Yes.

Q.    And what type of injury or injuries did you sustain?

A.    So I ruptured my Achilles tendon, and then I had like herniated and bulged disks up and down my neck

and back.

Q.    Did you have to have any surgeries for those injuries?

A.    Yeah.   I had two on my leg.

Q.    And did you miss any time from work as a result of those injuries?

A.    Yes.

Q.    How much time did you miss, approximately?

A.    I'll have to do some math.   So I think I got injured in December, December 17th.   I think I came back full-duty, I want to say August or September of '19. And then I was told I needed a second surgery of my leg, so I was put out, I want to say January or February of '20, on a limited duty, awaiting my surgery.

And then, of course, COVID hit.   And I don't think I had my surgery -- my second one -- in August of '20.   I don't think I came back to full duty until maybe April of '21.

So that second time, I would have been on limited duty from January to, I think, around August, while I awaited my second surgery.   I think I came back for, like, a month in there.   So --

Q.    And when you were on limited duty, what would you do, for example?

A.    So they assigned me to review our crash

Michael Bohn

investigation reports or investigations.

Q.    So you were reviewing a lot of reports?

A.    Yes.

Q.    And was there any discussion, when you finally came back, as to whether you could work as a patrol officer, given your injuries and surgeries?

A.    No.  I was to go back to full duty, with no restrictions.

Q.    Who made the decision, if you know, that you could go back to duty, on patrol?

A.    I would assume the surgeon, maybe.  I'm not sure.  I don't know.

Q.    You talked, I think in your interview, about some restrictions you felt you had.  Do you recall that, in reviewing your interview?

A.    Yeah.  I think you're referencing the fact that my foot doesn't bend like a normal foot anymore.  So things like squatting down, you know, I have to just separate my feet a little bit further than a normal person.  So I don't know how much of that is the injury or how much is just being 45 now.  I don't know.

Q.    Okay.  Which foot is it that doesn't bend?

A.    Well, it bends, but just not how I'd like it to.  It's my right foot.

Q.    Is that the foot that you ruptured your

Michael Bohn

Achilles?

A.    Yes.

Q.    So part of your restriction is the amount your right foot bends?

A.    Again, I wouldn't call it a restriction.  I would just say it doesn't bend like it did before the accident.  I have no work restrictions.

Q.    You -- so just so that I can understand this -- because a couple times in your interviews you talked about not wanting to be between the cars with Mr. Brafford, in case there was some kind of physical altercation.  Do you recall that?

A.    Yes.

Q.    And I think you were talking, in part, due to your injuries?

A.    Okay.

Q.    Do you -- do you recall talking about that in your interview?

A.    Yeah, I think so.

Q.    I'm just trying to understand what about your injuries made you not want to be between the cars if there was a physical altercation?

A.    Just the fact that I can't squat down as easily as I used to.  Like I was saying, I have to have my feet kind of separated.  So in a narrow space, you know, I

need more space to separate my feet if I'm going to squat down and maintain leverage on something, or along those lines.

Q.    Okay.    Did you generally feel that you moved a little slower than you did before your injuries?

A.    Yeah.    I mean, I'm not as fast as I was.

Q.    And did you have to see any of the doctors, you know, following that last surgery, just to follow up and see how you were doing?

A.    I mean, after the surgery, I would have went to them for, you know, follow-up appointments and physical therapy and whatnot.    But yeah, just regular stuff.

Q.    And after the physical therapy was completed, did you have to go to follow-up after that, or not?

A.    Perhaps.    I mean, I would think the doctor had the final write-up on that, so -- I'm not sure of the timeline.    But I don't remember if the physical therapy was before all that or -- but I would think so.

Q.    But you think you came back to work full-time following the second surgery in April of 2021?    Does that sound about right?

A.    Ballpark-ish.    I'm not sure of the exact date, but I think it was somewhere in there.

Q.    And the incident with Mr. Brafford would have happened when?

Michael Bohn

your left and your right hand.  Can you explain that a little bit?

A.    Sure.  Some things I will do with my left.  Some things I will do with my right.  I'm right-handed.  I eat with my right hand.  I shoot basketball with my right hand.

Q.    You're putting up your left hand, aren't you?  Is that your left hand or right hand.

A.    We may be inverted.  This is my right hand.

Q.    Oh, okay.

A.    All right.  So, yeah, I'll shoot basketball with my right hand.  I throw, swing a baseball bat and swing a golf club with my left hand.

Q.    All right.  Your duty weapon, is that on your right side?

A.    Yes, sir.

Q.    And your Taser would be on your left side?

A.    Yes.  Yes.

Q.    Can you shoot your Taser with your left hand or right hand?

A.    You -- you can.  I mean, it's -- it's awkward, I would think, to go, you know, backwards, but yeah.

Q.    So I know earlier in the day you had responded to a few collisions; and one in particular, you had to write a report.  Do you generally recall that?

Michael Bolan

Q.    And did you have the same shift hours?

A.    Ballpark-ish.  I'm not sure where I was the day before.  We had a fire going on, so I was probably out somewhere at the fire.  So I don't know if I got back at, you know, 13 hours; but it would have been, ballpark, a 12-hour shift.

Q.    Were there some fires going on at the time?

A.    Yes, sir.  I believe they were called the Mosquito Fire, but I'm not a hundred percent sure.

Q.    You referenced in your interview it was somewhat smoky on the day with Mr. Brafford?

A.    I remember the morning being quite smoky; and it cleared up as the day went on.

Q.    Do you recall the smoke affecting you a little bit?

A.    When I was further up the hill, I do remember thinking, like, this is actually bugging my throat.

Q.    So with respect to the call related to Mr. Brafford, you had some information that there had been, initially at least, a misdemeanor hit-and-run?

A.    Initially before I -- correct, yeah.

Q.    And you responded to the scene?

A.    I responded to where the victim and a witness or two were standing by.

Q.    What information did you generally have before

Michael Bolan

making contact with the victim and witness?

A.    I don't know if it's before contact, but I was told a white Jeep that had front-end damage.  And I want to say I was told that possibly two occupants, one maybe being bald.

Q.    Okay.  Anything else you can recall having information-wise, that you got before you spoke to the victim and witness?

A.    Again, I don't recall if that was information provided by dispatch or -- I'm not sure of the time frame of what information I learned.  But that was the initial basic information that I had.

Q.    Okay.  And then so are you saying some of it I may have come from dispatch and some of it may have come from talking to the victim?

A.    Correct.  I don't know offhand if -- correct. Yeah.  I don't know.

Q.    And then any other additional information you got from the victim or witness?

A.    Just kind of along the same lines.  The victim said she was rear-ended.  She estimated a white Jeep was going somewhere in the neighborhood of 90 miles an hour when it struck her and, as a result, she sustained injuries.  Yeah.

Q.    What injuries did she say she sustained?

Briann Brafford, et al. v. State of California, CHP, et al.
Focus Litigation Solutions

Page: 17

Michael Bolan

A.    I believe it was a complaint of pain to her neck and back, but I'm not a hundred percent certain.

Q.    Did you broadcast that she had sustained injuries?

A.    No.

Q.    Did you request medical for her?

A.    I might have asked if she needed it, but she declined any -- if I did, she declined, anything.  So --

Q.    Did you see any visible injuries on her?

A.    No.

Q.    Did you observe her vehicle?

A.    Yes.

Q.    In your mind, was the damage to the vehicle consistent with a 90-mile-an-hour crash?

A.    Nothing really stands out in the back of my mind.  I know the back of her vehicle was pretty messed up where she couldn't close her hatch, so I'm not quite sure how to answer that.  Her vehicle was still drivable afterwards.

Q.    Did you see the front of the Jeep at some point later?

A.    Briefly, yes.

Q.    Did the front of the Jeep, in your mind, look consistent with a 90-mile-an-hour crash?

A.    I would say no.

Michael Bolan

Q.   You would have expected more damage if there was a 90-mile-an-hour impact?

A.   Yeah, I wouldn't think you're driving away from something like that.

Q.   At some point, do you locate the Jeep at the Applebee's?

A.   Yes -- yeah.

Q.   And what information did you have that led you to Applebee's?

A.   While I was talking with the victim, I was -- my dispatch broadcast, I believe an additional person had followed in this vehicle.  They called a white Jeep in as driving reckless down Bell Road.  And someone had followed it into the Applebee's parking lot.  And I think they gave a license plate at that time.

Q.   And did you run the plate and have the plate run?

A.   I don't know if I ran it.

Q.   Do you know if someone did run it?

A.   I think that is, you know, dispatch protocol, but I don't remember.

Q.   Did you hear how it came back; in other words, whether there were any wants or warrants, or who it came back to?

A.   If dispatch did broadcast that information, she

Michael Bolan

-- they probably would have related the vehicle returned clear with an address out of wherever.

MR. GALIPO:  Marcel, if you are listening, I'd like to see if you could put up a photograph of Officer Bolan in his uniform.  I think it's CHP 01385.

(Reporter clarification.)

MR. GALIPO:  Yes.  We'll mark it as Exhibit 1. Thank you.

THE CERTIFIED STENOGRAPHER:  Sure.

(Exhibit Number 1 was marked.)

BY MR. GALIPO:

Q.    While we're waiting for, that what type of Taser did you have?

A.    I don't know.  I'm not sure.  I don't know the model of it or --

Q.    Okay.  Can you see the photo on your screen?

A.    Yeah.

Q.    Is that a picture taken of you at some point after this incident with Mr. Brafford?

A.    Yes, sir.

Q.    Does that look to be the uniform you were wearing?

A.    Yes, sir.

Q.    Did you have any physical injuries related to this incident?

Michael Bolan

A.   No, sir.

Q.   Any tears or rips in your uniform?

A.   No.

Q.   You told me earlier your gun would be on your right side?

A.   Yes.

Q.   What was the caliber of your weapon?

A.   It's a .40 caliber.

Q.   And that's a semi-automatic weapon?

A.   Yeah.

Q.   You fired two shots; is that correct?

A.   Yes, sir.

Q.   And then, did you -- where would you carry your Taser?  Would it be on your left side?

A.   Correct.  You can see the yellow -- it would be on my right side of the screen.  Yeah.

Q.   Okay.  And you're not sure what the model number was?  Whether it was a X27 or X2, you're not sure?

A.   I don't know.  Yeah.

Q.   Had you had training with respect to the use of the Taser?

A.   Yes.

Q.   And had you used the Taser in the field as a law enforcement Officer?

Michael Bolan

A.    I have trained with it.  I have never -- I don't recall ever Tasing anyone in the field, if that's what you're asking?

Q.    Did you have an understanding it could be used in a dart or probe mode, in other words firing it from some distance?

A.    Yes; that's how it works.

Q.    And did you have training as to what distance it can be used?

A.    I want to say they can shoot -- I want to say 20 or 25, I think.

Q.    20 or 25 feet?

A.    Yes; or something along those lines.

Q.    And did you have training with respect to whether, you know, the best range was like 7 to 15 feet, or something like that?

A.    Yeah.  I think the closer the distance between the individual, the more effective it -- the more accurate it would be of hitting what you're aiming at. You don't have TASERs dropping, or probes dropping, or --

Q.    And based on your training, your understanding that, if the two prongs strike the person, the goal is to get five seconds of involuntary muscle incapacitation?

Michael Bolan

A.    It should be all kind of where the probes hit. If there's a spread, it should incapacitate you; if they're together, it's most likely not going to.

Q.    So part of the goal is to get an adequate spread on the probes?

A.    Correct.   You kind of want to, I would say, split the belt line, one up, one down, one below.

MR. GALIPO:   Okay.   Thank you for that, Marcel.

BY MR. GALIPO:

Q.    At some point, were you considering requesting a backup unit to assist you?

A.    I don't believe there was reasonable time to do that.

At what point are you talking about here?

Q.    Well, at any point.  Let's start with the beginning.  You had information that the Jeep may be at Applebee's.  Did you request -- consider requesting another unit to meet you at Applebee's?

A.    At that time, no.  No.

Q.    When you initially had contact with Mr. Brafford, at any point in time did you consider calling for another unit?

A.    I did at one point where he -- yes.

Q.    When did you consider calling for another unit when you had contact with Mr. Brafford?

Briann Brafford, et all. v. State of California, CHP, et al.

Focus Litigation Solutions

Page: 23

Michael Bolan

the situation kind of seemed to kind of calm back down, or deescalate, or, you know, didn't seem like there was much of an issue there anymore.

Q.    And when in the chronology were you thinking that there might be a physical altercation, such that you didn't want to be between the vehicles?

A.    So the -- if I'm understanding your question right, that -- there was a trailer on this truck, so it's a low point of gravity.  I don't want to go tumbling over this if there's a fight.  So like I said, once it seems like he's not cooperating or he's angry or he's stepping towards me, that's when it kind of clicks that, hey, this may not go as planned or as hoped.

And then once he seems to kind of -- I don't know if "resigned" is the right word.  But when he seems to sort of comply with my request, it seemed to calm back down and it seemed like it was better, I guess.

Q.    Okay.  And if you call for backup, is that something you would do over your police radio?

A.    Correct.

Q.    And generally, when you request backup, does backup eventually arrive?

A.    Hopefully, eventually, yeah.

Q.    Did you feel -- prior to you asking Mr. Brafford to go back in his car to get his license or

Michael Bolan

registration, did you feel you had reasonable suspicion to detain him at that point?

A.    Based on the fact I was initially told that there was potentially two vehicle -- or two people in the vehicle, and my initial description of him that he was bald -- Mr. -- Travis was not bald.  I don't know if he is the driver or he is the passenger.  I -- I don't know who he is.

Q.    So are you saying you did not feel you had reasonable suspicion at that point?

A.    Correct.  I don't know who he is.  I have no idea who he is.

Q.    And, obviously, you would then agree that you did not have probable cause to arrest him at that point?

A.    My -- upon contacting him, it was -- seemed fairly clear that he was intoxicated.  But again, I don't know if he is the driver.  I don't know if he's an intoxicated passenger.  I don't know who he is.

Q.    Okay.  So given that, did you feel you had probable cause to arrest him at that point?

A.    At what -- what point are you talking about here?

Q.    At any point prior to you asking him to go back in his vehicle to get his license or registration.

A.    At some point in talking to him, I tell him

Michael Bolan

he's been in an accident.  And I remember him saying, "Oh, really?"

And so -- it -- it seems to me at that point he's involved in some way, shape, or form.  He's in the car; he knows something about it; or he's the driver. Based on the fact that there's no one else around this vehicle, it's starting to seem like he's probably the driver.  So he would have been detained until, you know, it was figured out.

Q.   Right.  That's what I'm trying to find out, your thinking at the time.

Before you asked him to go in the car to get his I.D., did you think you had the right to detain him?

A.   I did.

Q.   Did you consider handcuffing him at that point?

A.   No.

Q.   Did you believe you had probable cause to arrest him?

A.   He seemed intoxicated, so it's -- you know, I got there and his pants were unzipped, like he had just urinated somewhere.  So I think he could have been arrested, whether it be for DUI or public intoxication. And he seemed intoxicated, so, yes, I believe he could have been arrested.

Q.   Did you ever consider, tactically, to place him

Michael Bolan

in handcuffs and wait for backup to arrive, given the totality of the circumstances up to that point?

A.    No.

Q.    And why not?  Why did you decide not to call for backup, wait for backup, or put him in handcuffs at that point?

A.    So, yeah, once I asked him to go back to his vehicle, he seemed to -- like I said, he seemed resigned or -- I feel like I even motioned to him, like, that he wanted to go back to his car.  And he seemed compliant at that time.  It seemed like everything else had kind of calmed down.

You know, as an officer, sometimes you have to do this job on your own.  And at that point, since it calmed down, it seemed like everything was going to be fine.  So at that point it didn't seem like there was any need for backup.

Q.    Did you notice any injuries on Mr. Brafford?

A.    Yes.

Q.    What injuries did you notice?

A.    I feel like he had dried blood on his face and potentially a welt somewhere on his face or head.

Q.    Did you ask him if he was okay or needed medical attention?

A.    I don't know if those -- I don't know.  All I

Michael Bolan

can really remember him saying -- I told him he was in a crash, and he said, "Oh, really?"

Q.    I take it you had never seen him before?

A.    I don't believe so, yeah.

Q.    Did you know anything about his background?

A.    No.

Q.    Do you have an estimate as to his age?

A.    I would have said, you know, ballpark, my age. So at the time I would have been 42, so I would have said somewhere, give or take a few years, close to me.

        MR. GALIPO:  I'd like to mark as Exhibit 2, and you see if we can show CHP 01018, which I think is a picture of the Jeep.

        (Exhibit Number 2 was marked.)

BY MR. GALIPO:

Q.    Can you see that on your screen?

A.    Yeah.

Q.    Does that appear to be the Jeep?

A.    Yes.

Q.    And it looks like the front license plate is on the windshield?

A.    Yes.

Q.    The windshield appears to be cracked or splintered?

A.    Yeah.

Briann Brafford, et al. v. State of California, CHP, et al.
Focus Litigation Solutions

Page: 30

even recall seeing that before contact with him, so I don't think it would have any bearing on my interaction with him.

Q.   Okay.  But I'm just wondering, when you see that symbol you at least recognize it at a Marine Corps symbol?

A.   Sure.  Yes.

Q.   And then underneath it, you see where it says something like "Honoring Veterans"?

A.   Yes.  Yes, I see it.

Q.   Okay.  Thank you.

MR. GALIPO:  Thank you for that, Marcel.

BY MR. GALIPO:

Q.   Did you ever ask him if he had anything to drink?

A.   No.  We didn't get that far.

Q.   Did you ask him if he was either on drugs or medication?

A.   No.

Q.   Did he ever verbally threat to harm you?

A.   Not that I recall.

Q.   Did he ever punch you or attempt to punch you?

A.   No.

Q.   Did he ever kick you or attempt to kick you?

A.   No.

Michael Bolan

Q.    Did he ever try to tackle you to the ground?

A.    Like a football tackle?  No.

Q.    At some point, when he reached into the car, you saw some type of duffle bag in the car?

A.    Yeah -- yes.

Q.    And you tried to make a comment with him about working out, trying to establish some rapport at that point?

A.    Correct.

Q.    And you saw him at some point come out with a knife?

A.    Yes.

Q.    And it was in his right hand?

A.    Yes.

Q.    And how far away were you from him when he came out with the knife?

A.    So he would have been by his driver's side.  I would have been toward the left rear or rear of his vehicle.  So I'm not sure.  I would have to estimate, 8 to 10 feet maybe, or somewhere in that range.

Q.    And when he came out with the knife, did he immediately try to attack you with the knife?

A.    What do you mean by attack me?

Q.    Well, charge at you, raise the knife up, try to stab you with it?  Anything like that?

Michael Bolan

A.    No.   No.

Q.    At some point did you try to take cover, using a vehicle between him and yourself?

A.    No.

Q.    Were there any vehicles in the parking lot?

A.    Yeah.   It's a Saturday afternoon on a, you know, fall day.   It's moderately busy.

Q.    At some point were you backing up, away from him, as he was walking towards you?

A.    Yeah.   I was giving him commands to drop the knife or put the knife down, or something along those lines.

Q.    And what was the approximate distance between you and him, as you were backing away from him and he was walking towards you?

A.    I would estimate it to be about the same distance, about 8 to 10 feet, or kind of a parking stall distance width between us.

Q.    And when you say a "parking stall" -- I noticed you referenced that in the your interview -- are you talking about the width or length of the stall?

A.    How much -- yeah, the width.

Q.    Okay.   And you estimate that to be 8 to 10 feet; is that correct?

A.    Yeah.   Ballpark, yes.

Michael Bolan

Q.    So do you hear him say anything to you as he's walking in your direction with the knife?

A.    I know he's yelling at me.  And I don't recall -- the only thing I recall him saying is something along the lines of, like, "Are you going to shoot me?"; or "What are you going to do, shoot me?"  Something like that.

Q.    Okay.

A.    Go ahead.

Q.    Did you see him at some point make some gesture towards his forehead with a couple of his fingers?

A.    I don't recall him doing that at the time. It's in one of the videos.  It looks like -- it looks like he's doing something like that, or he's pointing at his eyes, or something like that.  But I don't recall that without the video.  And in that video, you can hear him responding no to my request to drop the knife.

Q.    Okay.  Did you hear that at the time?

A.    I just know he's yelling at me at the time.

Q.    You couldn't make out what he was saying, other than what you have already told me?

A.    Correct.

Q.    And then were you kind of situationally aware of what was behind you as you were backing up?

A.    I tried to be.  I don't know if I've been in

Briann Brafford, et al. v. State of California, CHP, et al.
Focus Litigation Solutions

Page: 37

Michael Bolan

that parking lot before.  I don't think I had.  So I know there's a building behind me and at some point, you know, I'd be walking into a thoroughfare or a street, if you will, that runs through the parking lot where the vehicles travel and stuff.

Q.    Were you aware there was a curb behind you, as you were walking backwards?

A.    I don't know if that was -- I don't know.  I might have assumed it, but I'm not sure.  Yeah.

Q.    Well, at some point your foot -- one of your feet hit a curb; is that correct?

A.    Yeah.  Yeah.

Q.    And do you know what that curb was to?

A.    I think I stepped in some bushes, so a planter of some sort or --

Q.    I guess what I'm wondering, as you were walking backwards, did you know the curb or planter was behind you?

A.    I'm not sure.  I know, like I said, there was a street or, you know, a thoroughfare for cars -- I don't know what you call it -- for cars in a parking lot.  I know that's behind me.  I don't recall ever thinking there is a curb or, you know, landscaping behind me.

Q.    And do you know which of your feet hit the curb?

Michael Bolan

A.   I'd -- I'd have to see the video.  I don't recall.

Q.   Was it one of your feet or both of them, if you know?

A.   I'm -- I'm not sure.

Q.   And do you know which part of your foot hit the curb?

A.   You mean like my heel or toes?

Q.   Yes.

A.   I want to say it -- my heel, but I'm -- yeah -- I'm not a hundred percent sure, but I'm pretty sure my heel.

Q.   Do you recall if it was your injured foot or your non-injured foot?

A.   Off the top of my head, I don't know.

Q.   And when your foot -- the heel of your foot hit the curb, did it cause you to lose your balance?

A.   Yeah, I stumbled a bit.

Q.   And how did you stumble?  Can you describe that to me, please?

A.   I'm not sure how to describe it.  I kind of lose my balance.  I use my arms for balance.  One hand kind of comes off my gun.  My hands kind of come out to the sides a little bit.  And that's how I regained my balance.

Michael Bolan

Q.    Okay.  I guess what I'm wondering is, did your body kind of go somewhat backwards into bushes?

A.    Excuse me.  I didn't fall down, if that's what you're asking.

Q.    Right.  I got that part.  I'm just wondering -- I guess someone can lose their balance and go forward, go to the side.  I'm just trying to imagine.  Are you saying you momentarily lost your balance going backwards over the curb?

A.    That's -- I guess -- that's how I would describe it, I guess.

Q.    And did you end up in this planter somehow, when you regained your balance?

A.    So -- I'm sorry.  So, yeah, I ended up stepping in the planter.

Q.    And do you believe both of your feet were in the planter when you regained your balance?

A.    I'm not sure.  I'd have to see the video.

Q.    Did you regain your balance before firing?

A.    I believe so.  He's still coming in at me, so I believe so.

Q.    So you would have been walking backwards.  One of your feet at least hit the curb.  It would have caused you to momentarily lose your balance, going backwards into the planter.  You regained your balance,

and then you fired your shots.  Did the ordering sound correct?

A.    Yes.  But like I said, I would need to see the video to see what foot it is, what -- where I'm at exactly.

Q.    How much time would you say had passed between your foot hitting the curb and you firing your shots?

A.    I'm not sure.

Q.    Do you know if it was more or less than a second?

A.    I -- I don't know.

Q.    Did you say anything to him in between your foot hitting the curb and you firing the shots?

A.    I don't believe so.

Q.    You were aiming at his upper body when you fired?

A.    Yeah.  Correct.

Q.    And your recollection is he had the knife down at his side as he was walking towards you?

A.    Correct.  It's, you know, swinging when he's walking.

Q.    But it's in his right hand, essentially at his side?

A.    At the time -- I'm not sure.  Like I said, it's moving when he's walking, so...

Michael Bolan

Q.   When you fired your shots, was the right -- the knife still in his right hand, down by his side?

A.   I'm not sure.  I know the blade is extended outwards, you know.  So if he wants to reach out and touch me, that blade is going to be there.

Q.   Do you specifically know where the knife was when you fired your shots?

A.   I'd have to see the video.

Q.   Do you have a specific recollection of where the knife was immediately before you fired?

A.   I want to say somewhere close to his side.  But again, I'm not sure where exactly it would have been.

Q.   Do you recall ever seeing the knife when he was walking towards you, anywhere other than down by his right side?

A.   It's moving as he's walking.  So, I mean, it's, you know, in your normal, I guess gait or swing of your arms.  So I'm not quite sure how to answer that.

Q.   I'm wondering if he ever raised it up to his chest or shoulder or side of his ear or over his head?

A.   Correct.  He didn't do any of those things.

MR. GALIPO:  Okay.  I think this is a good time, maybe, for our first break, if that's okay with everybody?

MS. WHITMORE:  Sounds great.

Michael Bolen

(Break taken.)

THE VIDEOGRAPHER:  We're going off the record at 11:07.

(Break taken.)

THE VIDEOGRAPHER:  We're back on the record at 11:20.

BY MR. GALIPO:

Q.   Prior to Mr. Brafford reaching into the vehicle -- so before that, did you believe he was ever assaultive towards you?

A.   When I tried stopping him from walking away, he pulls his shoulder away from me.  And then once we kind of stop, he takes another step closer to me.  So --

Q.   Did you feel that was assaultive?

A.    I feel that those were indicators that he -- like we talked about earlier, that this could potentially go south.  Those aren't normal -- go ahead.  Sorry.

Q.   No.  I'm sorry.  I didn't mean to cut you off.

A.   That's okay.

Q.   Is that the time period you considered calling for backup?

A.   Correct.  Correct, roughly that time.

Q.   Did you put your hands on his chest at some point?

A.    Yeah.   So I think in one of the videos, I think you can see the one -- where I reference him pulling away and kind of taking a step in.   After he takes that step in, you kind of -- I have my hand up, and you can see me kind of touch his chest, you know, like --

Q.    Did he swipe your hands away from him at that point?

A.    No. Just the initial pulling away.

MR. GALIPO:  So I don't know, Marcel, if we could put page 46 of the officer's transcribed interview up?  It's Bates stamp 228.

I just want to try to put a portion of this up and ask you a question about it.

THE WITNESS:  Okay.

MR. GALIPO:  First, we'll see if we can get it up, and then we'll ask.

THE WITNESS:  Okay.

(Pause.)

MR. GALIPO:  Marcel, are you working on that for us?

MR. SINCICH:  Yes, sir, just give me one second.  I'm sorry.

MR. GALIPO:  Thank you.  Just want to make sure you're still with us.

BY MR. GALIPO:

Michael Bolan

Q.    Page 46, Bates stamp 228.  Can you enlarge that, please?

MS. WHITMORE:  Dale, I have a paper copy of it that he's reviewing right now.

MR. GALIPO:  Okay.  Great.  Thank you, LeAnn.

MS. WHITMORE:  It's easier for him to see.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q.    So you see the line numbers on the left-hand side?

A.    Yeah.

Q.    And on line 3, you see where the -- well, starting at the top, I think we've already talked about this.  You're saying, "Because my foot doesn't bend, I can't do that between vehicles, if this is going to go more sideways."  Do you see that?

A.    Yes.

Q.    We've kind discussed that already.  Would you agree?

A.    Yes.

Q.    And then you say:  "When he tries walking away, it crosses my mind at this point, and I don't know if I did, but I feel like -- I'm not sure if I did, but I was, like, I might need another unit.  It crossed my mind.  I don't know if I put it out."  Do you see that?

Michael Bolen

Or "Are you going to shoot me?"  Or "What are you going to do shoot me?"  Something along those lines.

And then from the video, you can hear him responding "No" to my request to put down the knife.

In the same video, you can hear me tell him, "I don't want to shoot you."

Q.    Did you ever give him a verbal warning that you were going to shoot him?

A.    No.

Q.    When your foot hit the curb and you momentarily lost your balance, did the distance between Mr. Brafford and you decrease to some extent?

A.    I believe it did, yes.

Q.    And that's when you decided to shoot?

A.    Correct.  He's still approaching with the knife moving in his hands, you know, with the blade extended outwards.  That's when I decided to shoot, yes.

Q.    Did you ever say the blade was extended outward, at any point in your statement?

A.    I don't know if I used that phrase.

Q.    I don't remember seeing it.  Maybe it was in there.

Do you recall seeing that when you reviewed your interview recently?

A.    I don't recall.

Michael Bolan

Q.    Were you intending to shoot Mr. Brafford immediately before your foot hit the curb?

A.    My hopes the entire time were that Mr. Brafford would reconsider his actions and listen to my commands to drop the knife.

There was another person there who was giving him the same instructions.  So my intentions were it wouldn't come to this.

Q.    Okay.  So your intent was not to shoot him immediately before your foot hit the curb; is that fair?

A.    I remember feeling like he was closing in, and I was moving backwards in a parking lot where cars drive through.  And I remember thinking it's coming to ahead here pretty quick.

Q.    Obviously you didn't shoot him before your foot hit the curb; correct?

A.    Correct.

Q.    And why didn't you shoot him before your foot hit the curb?  In part because of the distance between you?

A.    Before -- yeah.  I mean, like I said, he's closing in the distance.  I was hoping at some point he would, like I said, reconsider or realize that this is -- this is not the thing to do here.  This isn't what we wanted to happen.

Michael Bolan

But at the same time, I realize I'm, you know, walking through a busy parking lot. He's backing me down. I don't really want to walk into a street where cars are still driving and get hit by a car, you know?

Q. And the guy that you're referring to, there was someone else, some civilian, yelling out something to Mr. Brafford?

A. Yeah. I don't know if he's -- I don't know if "yelling" is the right word. But he's essentially kind of telling him to listen to me. He's telling Travis to listen to me and to essentially drop the knife and do what he's being told.

Q. And that person was about 20 feet or so?

A. He would have been on -- correct -- like the other side of the -- where Travis was parked. So ballpark width of the -- I guess the aisle between where you park your cars.

Q. Now, do you recall in your statement saying that, as you were walking backwards, you felt you were doing a fairly good job of maintaining that 8- to 10-foot distance?

A. Yeah.

Q. You never indicated in your statement that he was closing the distance before your foot hit the curb; did you?

Briann Brafford, et al. v. State of California, CHP, et al.
Focus Litigation Solutions

Page: 52

Michael Bolan

know, like the Psycho movie kind of hacking motion.

So if that was the question, I would say no, he's not raising it, but it's swinging from his side in a natural motion when you walk. So it's --

Q. Right. But just so we're clear, the knife that you saw was in his right hand. His right arm was down by his right side. And what you're saying is that the right arm was moving in a natural walking motion?

A. Right. So I guess what I'm saying is I don't think I would categorize it just at his right side. To me, that's kind of saying, like, his arm is just kind of stuck there and it's not moving. It's moving with his natural gait. It's -- the knife is swinging, you know, like a person would walk. It's not just stuck there next to his side.

Q. I understand. But it's moving at a normal walking gait as opposed to, you know, raising it, like Psycho style?

A. Correct. Yes.

Q. And did you ever see him attempt to throw the knife at you?

A. No.

Q. Did you ever see him make a stabbing motion towards you?

A. Not that I recall, no.

Michael Bolan

Q.   And at any time while he was walking towards you, did he verbally threaten to harm you?

A.   I -- I don't -- I guess it's possible.  But like I said, the only things I recall him saying were, you know, "Are you going to shoot me?"  Or the things I already mentioned.

Q.   And so when you fired your two shots, did you hear any reaction from him?

A.   I believe there was like a grunt or a groan or a -- some sort of noise.

Q.   And did he go down to the ground?

A.   Yes.

Q.   Do you recall how he went down to the ground?

A.   What do you mean by that?  Like --

Q.   In other words, did he go on his back or crumple down, or forward?

A.   I would have to see one of the videos to get a precise one.  But I kind of want to say it was, kind of maybe on his knees, to his side, maybe.  I remember having to pull out his knees to get him flat.  So I'm not quite sure how to answer.

Q.   And what surface did he fall on?  Was it the parking lot surface?

A.   Yeah.

Q.   He didn't fall in the planter you were in, did

he?

A.    I don't believe so, no.

Q.    And at some point did you handcuff him?

A.    I did.

Q.    Did you have to move his body to handcuff him?

A.    Correct.  Yeah.

Q.    How did you move him in order to handcuff him?

A.    Like I just said, he was on his knees.  So I tried to get him flat.  I kicked the knife away, just to a position where I could access his arms easier, I guess.

Q.    And what position was he handcuffed in?

A.    I'm not sure what you mean.  His hands were handcuffed behind his back.

Q.    Was he chest down?

A.    I don't know if at that point if he was on his side or not.  I don't believe he was chest down, no.

Q.    But you recall handcuffing him behind his back?

A.    Yes.

Q.    Did he say anything to you after you shot him?

A.    At one point, I was able to get what I believed was the name Travis from him.  That was the only other thing he said to me, that I recall.

Q.    Did you notice any injuries on him after you shot him?

A.    Yeah.    Yes.

Q.    Can you describe what you observed and where?

A.    There was two bullet holes in his torso.

Q.    And do you recall what type of shirt or garment he was wearing?

A.    I want to say it was like a -- like a -- almost like a golf style shirt -- San Francisco -- excuse me -- a San Francisco Giants, like, polo shirt, with the SF, button-up.

Q.    And at some point you went back to your police unit?

A.    My car, yes.

Q.    And what did you do there?

A.    Once there, I put out radio traffic of what had occurred.  I eventually got a medic bag and ran it back to him.

Q.    And did units respond?

A.    Yes.

Q.    How long did it take for units to get there after you made your dispatch, if you can give me an estimate?

A.    I'm not certain I'm not sure.

Q.    Was one of the civilians helping you with -- in terms of medical care?

A.    Yeah.  The gentleman who was -- got out of his

Briann Brafford, et al. v. State of California, CHP, et al.
Focus Litigation Solutions

Page: 57

Michael Bolan

car was kind of giving Travis commands, was there assisting.  And then, eventually, a woman who identified herself as a nurse came up and tried assisting.

Q.   And was -- at least during some period of time after the shooting, did Travis appear to still be alive to you?

A.   Yeah.  He was still breathing until I got removed from the scene.

Q.   And how much time passed between the shooting and you getting removed from the scene, approximately?

A.   I'm -- I'm not sure.

Q.   Can you give me any estimate?  Do you know if it was 5 to 10 minutes?  Any range you're comfortable with?

A.   I'm not sure.  I would say over 10, but -- I mean, I'm just estimating.  I'm not certain.

Q.   Okay.  But prior to your removal, you did at least notice that Travis was still breathing?

A.   Correct.

Q.   Now, you mentioned a few times in your statement about having no sympathy or zero sympathy for people who are DUI.  Do you recall making statements like that?

A.   Yes.

Q.   And is that, in part, the way you feel because

of your work and also because you were hit by a DUI driver?

A.    Correct.    And so what that was referencing is sometimes -- yes, that's what -- yeah.

Q.    Give me one moment.  I'm looking at my notes. Okay?

A.    You got it.

Q.    Yeah.  I think you mentioned it, actually, a couple times in your interview, that you had no sympathy for drunk drivers.  Do you remember saying that?

A.    Yeah.  So what I'm referencing --

MS. WHITMORE:  You answered the question.

THE WITNESS:  Yes.

MR. GALIPO:  LeAnn, do you know if you're going to have questions today?

MS. WHITMORE:  Yeah, I'll have a couple.

MR. GALIPO:  Okay.  Why don't we take a five-minute break, if that's okay?  I'm going confer with Mr. Sincich, to see if I have any follow-up, and then I'll turn it over to you.

MS. WHITMORE:  Okay.  Sounds good.

MR. GALIPO:  Okay.  Thank you both.

THE VIDEOGRAPHER:  Okay.  Should we go off the record?

MS. WHITMORE:  Yes.

Michael Bolan

THE VIDEOGRAPHER:  Okay.  We are now off the record.

(Break taken.)

THE VIDEOGRAPHER:  We are back on the record at 1153.

BY MR. GALIPO:

Q.   As you were walking backwards in the parking lot after Mr. Brafford had the knife, were you trying to your best to keep that distance of 8 to 10 feet from him?

A.   I was.  There was a time where he kind of paused walking, when he turns to look at the other gentleman giving him directions.  So, you know, I kind of paused with him when he did that.

Q.   Okay.  When he paused, did the distance increase slightly, for a split second?

A.   I wouldn't think so.  I'm reacting to what he's doing.  So when he kind of pauses and looks over at the other gentleman, then it's kind of apparent to me that if Travis decides to go for this guy, then I have a whole other set of problems.  So I'm sure I waited for him to take a step forward towards me before I kept my movements backwards.

Q.   Did you ever see Travis try to go for that other person?

Michael Bolan

Q.    Yeah.  What I'm getting at is, what part of his body would have been closest to the planter when he fell to the ground, if you know?

A.    I'm not sure.

Q.    Do you know how close the closest part of his body was from the planter?

A.    I don't know.

Q.    Do you have any estimate?

A.    No.

Q.    Did he fall forward, if you recall, when he fell, or in some other manner?

A.    I don't recall.  I remember him, like I said earlier, kind of falling on his knees to his side area. I remember having to pull out his knees to get him flat.

Q.    Your training with respect to the use of deadly force, are you trained that you should only use deadly force if there's imminent or immediate threat of death or serious bodily injury?

A.    Yes.

Q.    And are you trained, for it to be imminent, it has to -- the person has to have the ability, opportunity, and apparent intent to immediately cause death or serious bodily injury?

A.    Yes.

Q.    And part of your training is that fear of

Michael Bolen

future harm is insufficient?  It has to be instantly confronted?

MS. WHITMORE:  Objection.  Vague.

THE WITNESS:  Answer?

MS. WHITMORE:  Yes.

THE WITNESS:  I'm sorry.  I got distracted with the objection.  What was the question?

BY MR. GALIPO:

Q.    The language of the statute that you're trained on says that fear of future harm is insufficient.  It has to be immediately happening and instantly confronted?

MS. WHITMORE:  Objection.  Vague.

THE WITNESS:  So, yeah, if I'm understanding you correctly, fear alone -- is that what you're asking?

BY MR. GALIPO:

Q.    Yes.   Are you aware that the Penal Code statute says that fear of future harm, no matter how great the fear, or how likely the harm, is insufficient to the use deadly force?  It has to be something that has to be instantly confronted?

A.    Correct.   Yes.

Q.    And you're trained you have to justify each shot?

A.    Yes.

Michael Bolan

A.   Something along the lines of "Drop the knife" or "Put the knife down."

Q.   Did he comply with your command?

A.   He did not.

Q.   Why did you fire your weapon?

A.   At that time, Travis had closed the distance, and he was an immediate threat to my safety.

MS. WHITMORE:  Thank you.

Nothing further.

FURTHER EXAMINATION

BY MR. GALIPO:

Q.   When you say at that time he closed the distance, you mean after your foot hit the curb and you momentarily lost your balance?

A.   His distance to me was closer at that time, but I believe he was gaining distance on me, like he was closing in on me prior to that.

Q.   Do you know if any video shows him closing the distance, prior to that?

A.   I don't know if the video from the back of the gym, if that would be the best one.  I'm not sure.

Q.   I guess the only reason I'm asking, in your interview, you appear to say that you were -- felt that you were keeping an 8 to 10 foot distance from him, and never mentioned closing the distance.  And now your

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )


          I, KIMBERLY E. D'URSO, do hereby certify:


          That the witness named in the foregoing

deposition was present remotely and duly sworn to testify

to the truth in the within-entitled action on the day and

date and at the time and place therein specified;

          That the testimony of said witness was reported

by me in shorthand and was thereafter transcribed through

computer-aided transcription;

          That the foregoing constitutes a full, true and

correct transcript of said deposition and of the

proceedings which took place;

          Further, that if the foregoing pertains to the

original transcript of a deposition in a federal case,

before completion of the proceedings, review of the

transcript [ ] was [ ] was not requested.

          That I am a certified stenographic reporter and

a disinterested person to the said action;

          IN WITNESS WHEREOF, I have hereunder subscribed

my hand this 8th day of June, 2025.

_____

KIMBERLY D'URSO, CSR NO. 11372, RPR


Briann Brafford, et al. v. State of California, CHP, et al.
Focus Litigation Solutions

Page: 67